**UNITED STATES, Appellee,**

v.

**Eric A. WEISS, Private U.S. Marine Corps, Appellant.**

No. 67,869.
NMCM 89 4189.

U.S. Court of Military Appeals.

Argued Oct. 6, 1992.
Decided Dec. 21, 1992.

For appellant: *Commander Philip D. Cave*, JAGC, USN (argued); *Captain Dwight H. Sullivan*, USMC and *Lieutenant Franklin J. Foil*, JAGC, USNR (on brief).

For appellee: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (argued); *Colonel T.G. Hess*, USMC (on brief).

*Amici Curiae* on behalf of appellant: *Colonel Malcolm H. Squires, Lieutenant Colonel James H. Weise, Major James M. Heaton* (on brief)—For Defense Appellate Division, USA. *Robert B. Weintraub, Joan E. Goldberg, Todd Gaziano* (on brief)—For the Committee on Military Justice and Military Affairs, Association of the Bar of the City of New York.

*Amici Curiae* on behalf of appellee: *Thomas E. Booth* (argued); *Robert S. Mueller* (on brief)—For the United States Department of Justice. *Lieutenant Commander Charles J. Bennardini* (argued)—For Appellate Government Division, USCG. *Colonel Richard L. Purdon, Lieutenant Colonel Jeffery T. Infelise, Captain Jane M.E. Peterson* (on brief)—For Appellate Government Division, USAF. *Colonel Dayton M. Cramer, Major Joseph C. Swetnam, Captain Donna L. Barlett, Captain Samuel J. Smith, Jr.* (on brief)—For Government Appellate Division, USA.

## Opinion

GIERKE, Judge:

A military judge sitting as a special court-martial convicted appellant, consistent with his pleas, of stealing a racquetball glove from the base exchange, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The approved sentence provides for a bad-conduct discharge, confinement and partial forfeitures for 3 months. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated January 31, 1992.

This Court granted review of the following issue:[1]

WHETHER APPELLANT'S COURT-MARTIAL LACKED JURISDICTION WHERE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION, AND WHETHER THE NAVY-MARINE CORPS COURT OF MILITARY REVIEW WAS WITHOUT POWER TO REVIEW THIS CASE WHERE ITS JUDGES WERE DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.

Appellant argues that military judges must be nominated by the President and confirmed by the Senate as military judges. The Government argues that military judges already have been nominated and confirmed as military officers, that military officers traditionally have performed judicial duties, and that military officers need not receive an additional appointment to perform judicial duties. We hold that the Constitution does not require that a military officer who meets the qualifications of Article 26, UCMJ, 10 USC § 826, receive a second appointment to perform the duties of a military judge. Likewise, we hold that a military officer meeting the qualifications of Article 66, UCMJ, 10 USC § 866, need not receive a second appointment to perform the duties of an appellate military judge.

### I. Appointment of Officers of the United States

Article II, § 2, para. 2, clause 2 of the Constitution—the Appointments Clause—provides that the President

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the Unit-

---

1. We also granted review of the following issue: WHETHER THE COURT-MARTIAL WHICH TRIED THIS CASE HAD JURISDICTION WHERE THE MILITARY JUDGE WAS NOT APPOINTED TO A FIXED TERM OF OFFICE, AND WHETHER THE NAVY-MARINE CORPS COURT OF MILITARY REVIEW HAD POWER TO REVIEW AND AFFIRM THIS CASE WHERE ITS JUDGES WERE NOT APPOINTED TO A FIXED TERM OF OFFICE. This issue was resolved adversely to appellant in *United States v. Graf*, 35 MJ 450 (CMA 1992).

ed States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

■ The purpose of the Appointments Clause is twofold: (1) it protects the prerogative of the President from congressional encroachment on his power to appoint his subordinates; and (2) "it limits the universe of eligible recipients of the power to appoint." *Freytag v. Commissioner of Internal Revenue*, 501 U.S. ——, ——, 111 S.Ct. 2631, 2639, 115 L.Ed.2d 764 (1991). Appellant argues that this second purpose, a limitation on the power to appoint, is violated by Articles 26 and 66 because they vest the appointment power in the Judge Advocate General rather than the President, the Courts of Law, or the head of a department.

The first question we must address is whether the Appointments Clause is applicable to the military justice system. Government counsel have not disputed this applicability of the Appointments Clause. Counsel for the United States Coast Guard, appearing as amicus curiae, argue that the Appointments Clause does not apply to the military justice system because that system is created pursuant to the plenary power of Congress "[t]o make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, and that the Supreme Court grants great deference to Congress in the exercise of that power. *See United States v. Kovac*, 36 MJ 521, 522–23 (CGCMR 1992); *United States v. Prive*, 35 MJ 569, 573–77 (CGCMR 1992).

■ We agree that "[j]udicial deference ... is at its apogee" when the authority of Congress to govern the land and naval forces is challenged. *Solorio v. United States*, 483 U.S.435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987). Nevertheless, congressional authority to raise, support, and govern the armed forces is separate from the authority to appoint Officers of the United States. Judicial deference is granted only to the former, a legislative power conferred by Article I of the Constitution. The appointment of Officers of the United States is an Executive power, conferred by Article II and controlled by the Appointments Clause, from which the armed forces are not exempt, either expressly or by implication.

In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court held that the plenary power of Congress over federal election practices did not exempt members of the Federal Election Commission from the Appointments Clause. The Supreme Court explained:

The position that because Congress has been given explicit and plenary authority to regulate a field of activity, it must therefore have the power to appoint those who are to administer the regulatory statute is both novel and contrary to the language of the Appointments Clause. Unless their selection is elsewhere provided for, *all* Officers of the United States are to be appointed in accordance with the Clause.... No class or type of officer is excluded because of its special functions.

*Id.* at 132, 96 S.Ct. at 688. Thus, we are compelled to conclude that, while Congress may determine how the military justice system will operate, it may not exempt those who will operate it from the Appointments Clause. Accordingly, we hold that the Appointments Clause is applicable to the military justice system.

■ The next question is whether the duties imposed on military judges by Articles 26 and 66 must be performed by an Officer of the United States, as that term is used in the Appointments Clause. Appellant contends, and we agree, that judicial duties may be performed only by "Officers of the United States," appointed in a manner consistent with the Appointments Clause. *See Freytag v. C.I.R.*, 501 U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (special trial judges of Tax Court); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931)

(United States commissioners). *See also Buckley v. Valeo,* 424 U.S. at 126, 96 S.Ct. at 685 ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed" in accordance with the Appointments Clause.).

All military trial judges and most appellate military judges are commissioned officers of their respective armed forces. Commissioned officers of the armed forces are "Officers of the United States." *See Wood v. United States,* 107 U.S. 414, 417, 2 S.Ct. 551, 554, 27 L.Ed. 542 (1883). All regular officers of the military services are appointed by the President and confirmed by the Senate. *See* 10 USC § 531; *see also* 14 USC §§ 211 and 212 regarding appointment of regular Coast Guard officers. Reserve officers above the grade of major/lieutenant commander are appointed by the President and confirmed by the Senate. *See* 10 USC §§ 593 and 5912. Active duty military officers are appointed and confirmed again upon each promotion to a grade above pay grade 0-3. *See* 10 USC § 624 (promotion of active-duty regular and reserve officers of the Army, Air Force, Navy, and Marine Corps).

▆ If judicial duties may be performed only by Officers of the United States, and military officers are Officers of the United States, the next question is whether military officers may perform judicial duties without a new "judicial" appointment. In *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), the Supreme Court had occasion to consider the nature and scope of the office held by military officers. The Supreme Court held that two military officers, the Chief of Engineers and the Engineer Commissioner for the District of Columbia, did not require second appointments as members of a commission created by Congress to select land for Rock Creek Park in the District of Columbia, survey it, map it, and determine the just compensation to be paid by the United States upon its condemnation. Justice Shiras explained:

As, however, the two persons whose eligibility is questioned were at the time of the passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate.

He went on to define "germane" broadly, observing:

It is true that it may be sometimes difficult to say whether a given duty, devolved by statute upon a named officer, has regard to the civil or military service of the United States. *Wales v. Whitney,* 114 U.S. 564, 569 [5 S.Ct. 1050, 1052, 29 L.Ed. 277 (1885) ]; *Smith v. Whitney,* 116 U.S. 167, 179, 181 [6 S.Ct. 570, 576, 577, 29 L.Ed. 601 (1886) ]. But, in the present case, the duty which the military officers in question were called upon to perform cannot fairly be said to have been dissimilar to, or outside of, the sphere of, their official duties.

147 U.S. at 301, 13 S.Ct. at 391.

Appellant argues that "the offices already held by them" were the specific offices of Chief of Engineers and Engineer Commissioner for the District of Columbia, and not the underlying office of military officer. A careful reading of *Shoemaker* requires that we reject that argument for two reasons. First, *Shoemaker* specifically referred to "the duty which the *military officers* ... were called upon to perform." (Emphasis added.) Second, the two cases cited in *Shoemaker* both dealt with the scope of military duties in general, not the specific duties of the positions held by the military officers. *Wales* addressed the question whether the medical duties of the Navy Surgeon General were "military" as opposed to "civil" duties. *Smith* addressed the issue whether the fiscal duties of the Navy Paymaster–General were of a civil or military nature.

■ The principle we glean from *Shoemaker* is that Congress may create a new office (*e.g.*, Rock Creek Park Commissioner) and give a military officer the duties of that office without making a new appointment necessary, if the new duties are "germane" to the military duties of that officer. Applied to this case, it means that a second "judicial" appointment is not required if: (1) Congress did not create a new "office"; or (2) Congress created a new office, but the duties of that office are "germane" to the duties of the military officer detailed to perform them. A second appointment would be required if Congress created a new office and the duties of that office were not germane to the duties of the military officer detailed to perform them.

## II. Military Judges

A court-martial is a temporary court, called into existence by a military order and dissolved when its purpose is accomplished. *See* Arts. 22, 23, and 24, UCMJ, 10 USC §§ 822, 823, and 824, respectively (prescribing who may convene courts-martial). Its constitutional origin is based on the congressional authority to govern the armed forces set out in Article 1, § 8, clause 14. As Colonel Winthrop explains, "Courts-martial of the United States, although their legal sanction is no less than that of the federal courts, being equally with these authorized by the Constitution, are, unlike these, not a portion of the Judiciary of the United States, and are thus not included among the 'inferior' courts which Congress 'may from time to time ordain and establish.'" W. Winthrop, *Military Law and Precedents* 49 (2d ed. 1920 Reprint).

Military judges perform duties prescribed by statute and the executive order when detailed to a specific court-martial. *See* Art. 26; Exec. Order No. 12473, April 13, 1984, 49 Fed.Reg. 17,152 (promulgating the new Manual for Courts–Martial); RCM 801–1011, 1102, 1104, Manual for Courts–Martial, United States, 1984. Military judges have no inherent judicial authority separate from a court-martial to which they have been detailed. When they act, they do so as a court-martial, not as a military judge. Until detailed to a specific court-martial, they have no more authority than any other military officer of the same grade and rank. To the extent that they perform judicial duties such as authorizing searches and reviewing pretrial confinement, their authority is not inherent but is either delegated or granted by executive order. *See* Mil.R.Evid 315(d)(2), Manual, *supra* (military judge may authorize searches *if* authorized by regulations of Secretary of Defense or Secretary concerned); RCM 305(g) (military judge may release from confinement); RCM 305(i)(2) and RCM 305(j) (military judge may review propriety of pretrial confinement).

To resolve the granted issue with respect to military judges, we must answer two questions: (1) Did Article 26 create a new office of "military judge"?; and (2) If so, are the duties of the new office germane to the duties of the military officer detailed as a military judge of a general court-martial or special court-martial?

### A. New Office

After examining the history and evolution of the military judge, set out in greater detail below, we conclude that Congress did not create a new "office" when it enacted: the Articles of War (AW) in 1920 (requiring that a "law member" be detailed to every general court-martial—AW 8); or the Uniform Code of Military Justice of 1950 (requiring detail of a "law officer" to every general court-martial—Art. 26, 50 USC § 590); or the Uniform Code of Military Justice of 1968 (redesignating the law officer as the military judge—Art. 26, 10 USC § 826).

As the position of military judge has evolved, the military judge has acquired virtually all the duties previously performed by the president and members of a court-martial. Prior to the 1920 amendments to the Articles of War, the president of a court-martial, who usually was not a lawyer, presided over the trial. *See* para. 89, Manual for Courts–Martial, U.S. Army, 1917. In 1920, AW 8 was amended to

require that a "law member" be detailed to general courts-martial in the Army. 41 Stat. 787, 788. AW 31 was amended in 1920 to transfer some duties of the president to the law member. It also provided that the law member ruled finally on questions of admissibility of evidence but could be overruled by a majority of the court members on other interlocutory questions. Until 1951, the Navy and Coast Guard continued the pre–1920 practice of using nonlawyers to preside over courts-martial and decide interlocutory questions. *See* §§ 381 and 370, Naval Courts and Boards, 1937; para. 385(t), Manual for Courts–Martial, U.S. Coast Guard, 1949 at 134.

When the Uniform Code of Military Justice, Pub.L. No. 81–506, 64 Stat. 108, codified in 50 USC §§ 551–736, recodified in 10 USC §§ 801–940 (1956), became effective in May 1951, the law member was redesignated as the law officer and additional duties were transferred from the president of the court to the law officer. All military services were required to "appoint" a law officer to general courts-martial. *See* Art. 26. Nonlawyers continued to preside over special courts-martial, Art. 51, UCMJ, 50 USC § 626, recodified in 10 USC § 851 (1956). This changed when the Military Justice Act of 1968, Pub.L. No. 90–632, § 2(9), 82 Stat. 1335, 1336, became effective in August 1969.

■ The Military Justice Act of 1968 changed the title of the law officer to military judge, in order to increase his stature, and transferred more duties from the president of the court-martial to the military judge. *See* Art. 26, 82 Stat. 1336. Since the Act merely transferred authority and duties from one official of the court-martial to another and renamed the law officer, it did not create a new office.[2] As the Supreme Court explained in *Shoemaker*, "It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed." 147 U.S. at 301, 13 S.Ct. at 391.

The Military Justice Act of 1968 also amended Article 16, UCMJ, 10 USC § 816, to authorize an accused to request trial by a court-martial composed of only a military judge. 82 Stat. 1335. When trying a case without members, the military judge sits as a one-member court-martial. A one-member court-martial was not new to military justice. *See* Art. 16(3), UCMJ, 50 USC § 576 (1950), recodified in 10 USC § 816(3) (1956) (summary court-martial); AW 7 (1916) (summary court-martial); Art. 64(b), Articles for the Government of the Navy (AGN) (1909) (deck court). When sitting as a one-member general court-martial or special court-martial, the military judge's authority is derived from the court-martial to which he is detailed, not from his status as a military judge. His authority is limited to that of the court-martial to which he has been detailed, and he may act only with respect to the cases referred to that court-martial. We conclude that the amendment of Article 16 did not create a new office but merely altered the composition of general courts-martial and special courts-martial.

Likewise, the amendment of Article 39(a), UCMJ, 10 USC § 839(a), effective in 1969, authorizing the military judge to hold sessions outside the presence of the members to dispose of interlocutory motions, arraign the accused, receive pleas, and dispose of other procedural matters not requiring the presence of the members, did not create a new office. The purpose and effect of Article 39(a) were to avoid wasting the time of the members by requiring them to sit idly by while the military judge disposed of legal and procedural issues.

---

2. In *United States v. Graf, supra*, this Court said, in dicta, *id.* at 455, that Congress "created" the military judge and the Courts of Military Review by enacting the Military Justice Act of 1968. We did not intend this imprecise dicta to hold that Congress created a new "office" in 1969, when the Act became effective.

Contrary to a dissenter's assertion that this view demeans military judges (36 MJ at 260 (Wiss, J., dissenting)), we believe that our opinion merely recognizes the awesome life-and-death authority traditionally entrusted to military officers.

S.Rep. No. 1601, 90th Cong., 2d Sess. 10 (1968), U.S.Code Cong. & Admin.News 1968, 4501. Article 39(a) did not confer new duties on the military judge; it merely authorized him to discharge those duties without wasting the time of the court members.

Since a new office was not created by the Military Justice Act of 1968, a second "judicial" appointment was not necessary for military judges. Accordingly, we hold that the military judge in appellant's case was not appointed in violation of the Appointments Clause.

### B. Germane Duties

Assuming, *arguendo*, that a new office was created at some time during the evolution of the military judge, the result is the same, because the duties of the military judge are the same as those traditionally performed by military officers serving as members of courts-martial. As such, they are germane to the duties of a legally trained military officer. *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361. Just as the duties of a Rock Creek Park Commissioner were germane to the duties of a military engineer, presiding over courts-martial is clearly germane to the duties of a military lawyer. Accordingly, a new appointment would not be required even if a new office was created.

### III. Appellate Military Judges

In order to resolve the granted issue with respect to appellate military judges, we must address three questions: (1) Did Congress create a new office?; (2) If Congress created a new office, are the duties of that office germane to the duties of the military officer detailed to perform them?; and (3) What is the significance of the provision in Article 66(a) authorizing civilian members on boards of review and their successors, the Courts of Military Review?

### A. New Office

Appellant contends that Congress established a new office by creating an intermediate appellate court for each service. We hold that a new office was created when boards of review were established.

Prior to 1920, there were no appellate military courts. Appellate review of courts-martial was accomplished by a hierarchy of reviewing, supervisory, and confirming authorities, all of whom were military commanders, cabinet officers, or the President. In 1920, the Articles of War, applicable only to the Army, were amended by enactment of AW 50½, which mandated: "The Judge Advocate General shall constitute, in his office, a board of review consisting of not less than three officers of the Judge Advocate General's Department." The board of review was required to examine every record of trial involving a sentence which required "approval or confirmation by the President." Furthermore, "execution of any ... sentence of a general court-martial involving the penalty of death, dismissal not suspended, dishonorable discharge not suspended, or confinement in a penitentiary," required review by the board of review and the Judge Advocate General. If the Judge Advocate General disagreed with the decision of the board of review, the record would be transmitted to the Secretary of War for the action of the President. AW 50½. On the other hand, special courts-martial and summary courts-martial were reviewed only by the officer appointing the court. AW 36 (1920). After the 1948 amendments of the Articles of War, effective February 1, 1949, certain Army and Air Force general court-martial cases were reviewed by a board of review, a Judicial Council composed of three general officers of the Judge Advocate General's Corps, and the Judge Advocate General. *See* AW 50 (1948).

Prior to 1951, a Navy general court-martial was reviewed by "the commander of the fleet or officer ordering the court." 53d AGN (1934). A summary court-martial (the counterpart of the modern special court-martial) was reviewed "by the officer ordering the court ... and by his immediate superior in command." 32d AGN. A sentence "extending. to the loss of life, or to the dismissal of a commissioned or warrant officer" required confirmation by the President. 53d AGN. A deck court (the

counterpart to the modern summary court-martial) was reviewed *by the officer who ordered it.* AGN 64(d). Reviewing authorities were required to examine jurisdictional issues, the legal sufficiency of the pleadings, objections to evidence, and the legal sufficiency of the evidence. *See, e.g.,* § 472, Naval Courts and Boards, 1937.

Prior to 1951, a Coast Guard deck court was reviewed "by the officer ordering" it and then was forwarded to Coast Guard Headquarters, where it was "reviewed for legality ... with the same force and effect as though an appeal had been taken." The Commandant of the Coast Guard was authorized to take whatever action "the interests of justice and equity may require." The accused had a "right to appeal to the Secretary of the Treasury from a decision of a deck court." Arts. 31 and 36, Manual for Courts–Martial, U.S. Coast Guard, 1949. All other courts-martial were reviewed by the Secretary of the Treasury, and the President in the case of dismissal of an officer. 14 USC § 564(d)(1949); Art. 140, Manual, USCG, *supra.* No Coast Guard court-martial could impose a sentence exceeding a discharge, confinement for 5 years, forfeiture, and reduction. 14 USC § 564(b) and (c); *see* Art. 50, Manual, USCG, *supra.*

After the Uniform Code of Military Justice became effective in 1951, convening authorities in all services retained the authority and responsibility to review the record of trial for legal sufficiency. *See* Art. 64, 50 USC § 651, recodified in 10 USC § 864 (1956) ("[T]he convening authority shall approve only such findings of guilty, and the sentence or such part or amount of the sentence, as he finds correct in law and fact....").

The 1950 Code made boards of review mandatory for the Navy, Marine Corps, and Coast Guard. They were already mandatory for the Army by virtue of AW 50½, enacted in 1920. This AW was made applicable to the Air Force by 62 Stat. 1014 (1948), codified in 5 USC § 627k (1948). Article 66(a) (1950) mandated:

The Judge Advocate General of each of the armed forces shall constitute in his office one or more boards of review, each composed of not less than three officers or civilians, each of whom shall be a member of the bar of a Federal court or of the highest court of a State of the United States.

Effective in 1969, Article 66(a) was revised to its present language, as follows:

Each Judge Advocate General shall establish a Court of Military Review which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges.... Appellate military judges who are assigned to a Court of Military Review may be commissioned officers or civilians, each of whom must be a member of a bar of a Federal court or of the highest court of a State....

Boards of Review were a new entity, created by Congress for the Army in 1920, the Air Force in 1948, and the Naval services in 1951. For the first time, there was a level of formal appellate review beyond the officer who convened the general court-martial. Also, for the first time, a permanent military tribunal was established, as compared to courts-martial which are temporary entities. Article 66 vested no discretion in the Judge Advocates General; boards of review were mandatory. We are satisfied that Congress, acting indirectly through the Judge Advocates General, created a new office by establishing boards of review. *Cf. Dettinger v. United States,* 7 MJ 216 (CMA 1979) (Congress, acting through Judge Advocate General, created Court of Military Review).

Unlike the Court of Military Appeals, created in 1950 as an instrument of civilian oversight imposed upon the military services, the boards of review were intended as military tribunals constituted by competent military authority from within each service. The mandate to each Judge Advocate General to "constitute" boards of review was consistent with the traditional practice of vesting the authority and responsibility for constituting military tribunals in military

officers and giving them the authority to appoint the members.

That Congress intended the boards of review to be tribunals of a different nature from the Court of Military Appeals is apparent both from the language of the statutes creating them and the legislative history. The statute first creating the Court of Military Appeals used traditional language for creating a civilian Article I court: "There is hereby established a Court of Military Appeals...." Art. 67(a)(1), 64 Stat. 129 (1950). In 1969 the provision was amended to read: "There is a United States Court of Military Appeals established under article I of the Constitution of the United States...." Finally, in Article 141, 10 USC § 941 (1989) Congress described the Court's status as follows: "There is a court of record known as the United States Court of Military Appeals. The court is established under article I of the Constitution." This is virtually the identical language used by Congress to create other Article I courts. *See* 26 USC § 7441 ("There is hereby established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court."); 38 USC § 7251 ("There is hereby established, under Article I of the Constitution of the United States, a court of record to be known as the United States Court of Veterans Appeals."). The language creating the boards of review was substantially different: "The Judge Advocate General of each of the armed forces shall constitute in his office one or more boards of review...." 50 USC § 653 (1950), recodified in 10 USC § 866 (1956).

This difference in language was not accidental. Indeed, in 1966, Senator Sam Ervin held hearings on a bill to establish a Court of Military Review in each service which would have been appointed by the service secretary and whose judges, both military and civilian, would have served for a fixed term of office. That bill used language similar to the organic statutes for the Court of Military Appeals, the Tax Court, and the Court of Veterans Appeals. It would have amended Article 66(a) to read: "There is established for each military department an appellate court.... Each such court is a court of record and shall be known as the Court of Military Review for the military department for which it is established." Joint Hearings before the Subcomm. on Constitutional Rights of the Senate Judiciary Comm. and the Special Subcomm. of the Senate Armed Services Comm., 89th Cong., 2d Sess. 497–98 (1966). The bill was not enacted. Two years later, Article 66(a) in its present form was enacted.

The Senate Hearings on the 1950 Code reveal the intent of the drafters to use military expertise on the boards of review. The following exchange between Senator Kefauver and Professor Morgan is instructive:

> SENATOR KEFAUVER.... May I ask at this point, was there any difference of opinion on the part of the committee or extensive discussion as to whether each service should have its own reviewing section?
>
> MR. MORGAN. No; the committee was unanimous on that, so far as the board of review is concerned.
>
> The notion was that each service would know more about the customs of the service, and all that sort of thing, and that the Judge Advocate General of that particular service would be the man that would be most competent to handle that thing from the point of view of this board of review, because the board of review, now, has very extensive powers.

Hearings on S. 857 and H.R. 4080 Before a Subcomm. of the Senate Armed Services Comm., 81st Cong., 1st Sess. 42 (1949).

The amendments enacted in 1968 to Article 66(a) did not change the character or authority of the boards of review but merely completed the evolution by calling them what they were: appellate courts composed of appellate military judges. The legislative history of the 1968 amendment reflects that the redesignation of boards of review as Courts of Military Review was only a name change, designed to enhance the stature of the board of review by calling it a

court and calling its members judges. This change was consistent with redesignating law officers as military judges. *See* S.Rep. No. 1601, 90th Cong., 2d Sess. 3, 14 (1968); The Army Lawyer: A History of The Judge Advocate General's Corps, 1775–1975 at 247 (U.S. Govt. Printing Office). Certain organizational changes were mandated to improve efficiency and protect the independence of appellate military judges; but no new authority was conferred, no new duties imposed, and no new appointment procedures for appellate military judges were established.

### B. Germane Duties

Turning to the second question, we observe that military officers traditionally have been responsible for legal review of court-martial convictions in their capacities as reviewing and supervisory authorities. Prior to the creation of boards of review, military commanders were responsible for the legal review of courts-martial convened by them or their subordinates. *See* 53d AGN (1934) (record reviewed by "commander of the fleet or officer ordering the court"); 32d AGN (1934) (summary court-martial reviewed by "officer ordering the court" and "his immediate superior in command"); AW 46 and 47 (1920) (record reviewed by convening authority); para. 35, Manual for Courts–Martial, U.S. Coast Guard, 1949 (deck court reviewed by Commandant of Coast Guard); § 472, Naval Courts and Boards, 1937 (commander reviewing the record must examine jurisdictional issues, legal sufficiency of pleadings, objections to evidence, and legal sufficiency of evidence).

A cadre of legally trained officers existed in each of the services prior to 1920. The language of Article of War 50½ and Article 66 of the Code reflect that Congress had this cadre of legally trained officers in mind when boards of review were first created in 1920 and extended to all the services in 1951. Congress considered the duties of the boards of review not only germane to military duties, but particularly appropriate for military lawyers. We hold that the duties of the newly-created boards

of review were "germane" to the duties of the legally trained military officers contemplated by AW 50½ and Article 66 of the Code; therefore, we hold that a second judicial appointment is unnecessary.

### C. Civilian Members

Turning finally to the significance of the provision for civilian members, the legislative history of Article 66(a) reflects that the historical antecedent of the boards of review created by Article 66(a) was the Army board of review, composed of military officers, which was created by AW 50½. The provision for civilian members was not included in AW 50½, but was added to Article 66(a) at the request of the Coast Guard. During the 1949 hearings on the proposed Uniform Code of Military Justice, Mr. Larkin explained the provision for civilian members as follows:

> Well, they were included initially at the request of the Coast Guard—not that it be worded this specific way but the Coast Guard does have civilian lawyers working in their court-martial procedures during peacetime, and they feel they are very competent.
>
> They don't have an unusually large number·of officers in their review, and they wanted to be free if they desired to appoint a civilian lawyer working for the Coast Guard to a board of review. This was the easiest way to make that provision.

Hearings on H.R. 2498 before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 1189 (1949), *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1950).

█ In appellant's case we need not decide whether Congress inadvertently exceeded its authority by vesting the powers of an "Officer of the United States" in civilians who had not been appointed in accordance with the Appointments Clause, because no civilians participated in the appellate review of his case. We regard the provision for civilian members of boards of review and their successors, the Courts of Military Review, as severable from the remainder of Article 66(a). Congress had

two purposes in enacting Article 66(a). The primary purpose was to make boards of review mandatory for all services. The secondary purpose was to accommodate the Coast Guard by authorizing civilian members on boards of review. Where a statute attempts to accomplish two or more objects, it may be valid as to one and invalid as to others, as long as its purpose can be accomplished by the valid part and is not dependent upon or conditioned by the invalid part. *Sutherland Stat. Const.* § 44.07 at 503–04 (4th Ed.1986 Revision).

### D. Conclusion

Applying the *Shoemaker* analysis to appellant's case, we hold that appellate military judges need not be reappointed to perform judicial duties because judicial duties are "germane" to the offices already held by them as legally trained commissioned officers of their respective armed forces. Accordingly, we hold that appointment of the appellate military judges who reviewed appellant's case was consistent with the Appointments Clause.

We have not addressed the desirability of a legislative requirement that trial and appellate military judges be specifically appointed as judges by the President, a Court of Law, or the Head of a Department, and we consider it inappropriate to do so. Congress has the power to require a second "judicial" appointment if considered desirable. Congress considered such a measure in 1966 but did not enact it. We decide only that a second "judicial" appointment was not constitutionally required for the trial and appellate judges involved in appellant's case. As we stated in *United States v. Henderson*, 34 MJ 174, 178 (CMA 1992), "As a court ... we are not involved in the merits of ... policy. We interpret statutes, and we can strike them down only when they violate the Constitution."

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judge COX concurs.

CRAWFORD, Judge (concurring in the result):

The lead opinion has put forward a thoughtful and well-reasoned analysis of how Article II, section 2, paragraph 2, clause 2, of the United States Constitution is not violated by the present manner of selecting military judges. However, I part ways with the underlying premise of the lead opinion that the Appointments Clause applies to the selection of a military judiciary and therefore can only concur in the result.

In concluding that the Appointments Clause does not apply either to selection of military trial or military appellate judges, one of necessity must engage in both an historical and a contemporary analysis of the Constitution and its Appointments Clause. In applying both approaches, the intentions of the Framers can be determined from documents that are available. *See, e.g.,* 4 P. Kurland & R. Lerner, *The Founders' Constitution* (hereafter Kurland) (1987); J. Harris, *The Advice and Consent of the Senate* (hereafter Harris) 25–30 (1953).

### A. The Historical Approach

At the time of the Constitutional Convention in Philadelphia from late May to mid-September 1787, no thought was given to how the Appointments Clause should be applied to military trial and appellate judges. Kurland, *supra* at 28–38. Two major themes dominated the debates which shaped the Appointments Clause. First, those who opposed a strong executive resisted giving the chief executive the nomination authority over the national judiciary without some sort of Council to screen the appointment process. Second, those who opposed a strong legislature feared that if the appointment authority was given to the legislative branch, the appointment of a national judiciary would fall into the hands of certain factions. Harris, *supra* at 25–30.

At the time of these debates there was no military judiciary in place, that function being served by military officers. There was, however, a great deal of debate and

attention paid to a federal civilian judiciary as evidenced by Alexander Hamilton's discussions in *The Federalist Papers*, Nos. 78 through 83.[1] Thus, historically, the Founding Fathers gave no explicit consideration to including a military judiciary within the ambit of the Appointments Clause.

## B. The Contemporary Approach

A contemporary approach to reviewing our Constitution and its provisions looks at the intent of the Framers and the interests and values they meant to protect. A contemporary reading of the Constitution is important because as John Marshall stated: "[I]t is a constitution we are expounding." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). The Constitution is a living document and "states or ought to state not rules for the passing hour, but principles for an expanding future," B. Cardozo, *The Nature of the Judicial Process* 83 (Yale Univ. Press 1921), and "a principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910).

Utilizing a contemporary analysis I start by asking what interests and values were meant to be protected by the Appointments Clause. It is undisputed that the Appointments Clause was designed as a series of checks and balances between the Executive and Legislative Branches on the creation and filling of offices. Kurland, *supra* at 33. The Framers were concerned with a division of power to prevent one branch from becoming more powerful than the other.

The debates among the Framers over appointments authority in general and judicial appointments in particular bear out their desire for checks and balances as well as for qualified appointees. Edmund Randolph of Virginia argued that if appointment authority was in the legislative branch, this "generally resulted from cabal, from personal regard, or some other consideration than a title derived from the proper qualifications." Whereas George Mason, also of Virginia, argued that, if the appointment to the judiciary was with the executive, it was "a dangerous prerogative. It might even give him an influence over the Judiciary department itself." *Id.* at 33.

Alexander Hamilton of New York thought that giving the Senate approval authority over nominations would be a check on the "spirit of favoritism of the President" and would work against the appointment of unqualified individuals or individuals selected because of a family connection or personal attachment. Harris, *supra* at 28. Hamilton argued that to empower the legislature with appointment authority would just lead to "intrigue and cabal." *Id. Cf. Kurland, supra* at 31. Nathaniel J. Ghorum (also spelled Gorham in some texts) of Massachusetts thought it best that the Executive be responsible for appointment because "he will be careful to

1. No. 78, "A VIEW OF THE CONSTITUTION OF THE JUDICIAL DEPARTMENT IN RELATION TO THE TENURE OF GOOD BEHAVIOR," wherein Hamilton discusses "the doctrine of judicial review," stating: "Whenever a particular statute contravenes the Constitution, it will be the duty of the judicial tribunals to adhere to the latter and disregard the former."

No. 79, "A FURTHER VIEW OF THE JUDICIAL DEPARTMENT IN RELATION TO THE PROVISIONS FOR THE SUPPORT AND RESPONSIBILITY OF THE JUDGES," wherein Hamilton expresses "[t]houghts on the salary, tenure, accountability, and age of judges."

No. 80, "A FURTHER VIEW OF THE JUDICIAL DEPARTMENT IN RELATION TO THE EXTENT OF ITS POWERS," wherein "Hamilton traces the outlines of the judicial power."

No. 81, "A FURTHER VIEW OF THE JUDICIAL DEPARTMENT IN RELATION TO THE DISTRIBUTION OF ITS AUTHORITY," wherein Hamilton "states the case for a distinct, learned, independent Supreme Court, then speculates on the relations of the Supreme Court to the lower courts."

No. 82, "A FURTHER VIEW OF THE JUDICIAL DEPARTMENT IN REFERENCE TO SOME MISCELLANEOUS QUESTIONS," wherein Hamilton discusses "the relations of the federal and State courts."

No. 83, "A FURTHER VIEW OF THE JUDICIAL DEPARTMENT IN RELATION TO THE TRIAL BY JURY," wherein "Hamilton attempts ... to quiet the fears of" some with a discussion "of this ancient 'palladium of free government.'"

*The Federalist Papers*, xxx-xxxi (A. Hamilton, J. Madison, J. Jay)(C. Rossiter 1961).

look through all the States for proper characters." *Id.* at 31. To prevent dependency on a single individual making the appointment, some Framers thought it best to have the Senate vote on the appointments. Others were concerned that a Senate vote would mean too "much fettering [in] the Senate." *Id.* at 32. Eventually the Framers settled on appointments by the executive with the advice and consent of the Senate.

In defense of the appointment power enunciated in the Constitution, Alexander Hamilton in *The Federalist* No. 66 commented as follows on how the appointment power would work:

> It will be the office of the president to *nominate,* and with the advice and consent of the senate to *appoint.* There will of course be no exertion of *choice* on the part of the senate. They may defeat one choice of the executive, and oblige him to make another; but they cannot themselves *choose*—they can only ratify or reject the choice, he may have made. They might even entertain a preference to some other person, at the very moment they were assenting to the one proposed; because there might be no positive ground of opposition to him; and they could not be sure, if they withheld their assent, that the subsequent nomination would fall upon their own favourite, or upon any other person in their estimation more meritorious than the one rejected. Thus it could hardly happen that the majority of the senate would feel any other complacency towards the object of an appointment, than such, as the appearances of merit, might inspire, and the proofs of the want of it, destroy.

*The Federalist: A Collection of Essays Written in Favour of The New Constitution,* vol. II at 218–19 (J. and A. McLean, New York, 1788)(hereafter cited as McLean).

Thus the interests and values of providing for the selection of officers, including judicial officers, based on merit and dividing power between the executive and legislative branches gave birth to the Appointments Clause. The question remains whether, in order to protect those interests and values, it is necessary to select military trial and appellate judges pursuant to the Appointments Clause. In order to answer that question we must also examine the additional interests and values unique to national security and military matters which the Framers sought to protect. In so doing we can determine whether these other factors justify treating the military judiciary different from the federal civilian judiciary and thereby render the Appointments Clause inapplicable to military judges.

### C. Analysis

Because of national security interests and concerns for unforeseen military exigencies, it was the intent of the Framers to vest great authority over these matters in Congress. L. Tribe, *American Constitutional Law* 353–56 (2d ed.1988). They accomplished this in the Constitution through the enumerated powers of Article I, Section 8, Clauses 11 through 16 and 18. Under the enumerated powers, Congress has the power to "raise and support Armies" (cl. 12); "provide and maintain a Navy" (cl. 13); "make Rules for the Government and Regulation of the land and naval Forces" (cl. 14); and "make all laws that are .... necessary and proper" (cl. 18).

The rationale for this approach by the Framers is found in Alexander Hamilton's *Federalist* No. 23:

> The authorities essential to the care of the common defence are these—to raise armies—to build and equip fleets—to prescribe rules for the government of both—to direct their operations—to provide for their support. These powers ought to exist without limitation: *Because it is impossible to foresee or define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them.*[*] The circumstances that endanger the safety of nations are infinite; and for this reason, no constitutional shackles can wisely be imposed on the power to

which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils, which are appointed to preside over the common defence.

\*     \*     \*

Whether there ought to be a federal government intrusted with the care of the common defence is a question, in the first instance, open to discussion; but the moment it is decided in the affirmative, it will follow, that that government ought to be cloathed with all the powers requisite to the complete execution of its trust. And unless it can be shewn, that the circumstances which may affect the public safety are reducible within certain determinate limits; unless the contrary of this position can be fairly and rationally disputed, it must be admitted as a necessary consequence, that there can be no limitation of that authority, which is to provide for the defence and protection of the community, in any matter essential to its efficacy; that is, in any matter essential to the *formation, direction* or *support* of the NATIONAL FORCES.

McLean, *supra,* vol. I at 144–45 (some emphasis [\*] added).

This view was underscored by James Madison in *The Federalist* No. 41:

But was it necessary to give an IN-DEFINITE POWER of raising TROOPS, as well as providing fleets; and of maintaining both in PEACE, as well as in WAR?

The answer to these questions has been too far anticipated, in another place, to admit an extensive discussion of them in this place. The answer indeed seems to be so obvious and conclusive as scarcely to justify such a discussion in any place. With what colour of propriety could the force necessary for defence, be limited by those who cannot limit the force of offence? If a federal Constitution could chain the ambition, or set bounds to the exertions of all other nations, then indeed might it prudently

chain the discretion of its own government, and set bounds to the exertions for its own safety.

McLean, *supra,* vol. II at 39.

Yet the Framers, mindful of the new nation's fears regarding establishment of a standing armed force in peacetime, S. Padover, *To Secure These Blessings* 203–08 (1962), did not propose to give the new executive and legislature this great authority without some limitation. Article I, Section 8, Clause 12, gives Congress the authority to "raise and support Armies" but also provides that "no Appropriation of Money to that Use shall be for a longer Term than two Years." In *The Federalist* No. 26, Alexander Hamilton puts forth a spirited defense of this clause that limits appropriations for military purposes to two Years:

The legislature of the United States will be *obliged* by this provision, once at least in every two years, to deliberate upon the propriety of keeping a military force on foot; to come to a new resolution on the point; and to declare their sense of the matter, by a formal vote in the face of their constituents. They are not *at liberty* to vest in the executive department permanent funds for the support of an army; if they were even incautious enough to be willing to repose in it so improper a confidence. As the spirit of party, in different degrees, must be expected to infect all political bodies, there will be no doubt persons in the national legislature willing enough to arraign the measures and criminate the views of the majority. The provision for the support of a military force will always be a favourable topic for declamation. As often as the question comes forward, the public attention will be roused and attracted to the subject, by the party in opposition: And if the majority should be really disposed to exceed the proper limits, the community will be warned of the danger, and will have an opportunity of taking measures to guard against it. Independent of parties in the national legislature itself, as often as the

period of discussion arrived, the state legislatures, who will always be not only vigilant, but suspicious and jealous guardians of the rights of the citizens, against incroachments from the federal government, will constantly have their attention awake to the conduct of the national rulers, and will be ready enough, if any thing improper appears, to sound the alarm to the people, and not only to be the VOICE, but, if necessary, the ARM of their discontent.

McLean *supra,* vol. I at 165–66.

An examination of the military judiciary, although similar to its civilian counterpart in the importance and scope of its duties, also reveals marked dissimilarities from a civilian judiciary because of the ever-existent potential for military exigencies. "Military exigencies" is not a term of art; our armed forces are not a garrison force. In the past 4 years alone, our military men and women have deployed to Panama in Operation Just Cause and to Southwest Asia in Operations Desert Shield and Desert Storm. In addition, they have participated in the humanitarian mission to aid Kurdish refugees, Operation Provide Comfort, following Operation Desert Storm. Even as this opinion is being released, our troops are serving in Somalia as part of a relief effort called Operation Restore Hope.

These missions require worldwide deployment and the need for instant mobility and flexibility in assignments, including military judge assignments. Military judges must try cases in combat environments, and, due to the potential for military judge casualties, replacements must be available at a moment's notice. The ever-expanding role of the military only underscores the wisdom of our Founding Fathers in entrusting Congress with the authority and responsibility for providing for its day-to-day operations.[2]

In carrying out its enumerated responsibilities Congress has paid careful attention to the military justice system. Starting in 1950 with the adoption of the Uniform Code of Military Justice, Congress has been very active in expanding the status and power of the military judge. In 1950, Congress provided for the law officer who was the forerunner of the military trial judge. *See* Pub.L. No. 81–506, 64 Stat. 117. In the Military Justice Act of 1968, Pub.L. No. 90–632, 82 Stat. 1335, Congress provided for military judges (at 1336) and the Courts of Military Review (at 1341). *See generally* Cox, *The Army, The Courts, and The Constitution: The Evolution of Military Justice,* 118 Mil.L.Rev. 1 (1987); Criminal Law Note: *An Ongoing Trend: Expanding the Status and Power of the Military Judge,* The Army Lawyer 23 (Dept. of the Army Pamphlet 27–50–239, October 1992).

In addition to his or her constitutional role as Commander–in–Chief, U.S. Const. art. II, § 2, the President has a specific role for military justice matters. Pursuant to its authority under the Constitution, Congress, through Article 36(a), Uniform Code of Military Justice, 10 USC § 836(a) (1979), has given the President the authority to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof, for ... [trials by] courts-martial." Based on this delegation of authority from Congress, the President has by Executive Order set forth many rules in the Manual for Courts–Martial, United States, 1984, that pertain to the authority of the military judge. *See generally* 1 F. Gilligan and F. Lederer, *Court–Martial Procedure* 514–56 (1991).

In fulfilling its responsibilities, Congress has been mindful of the interests sought to be protected by the Appointments Clause. First, with respect to selection of qualified individuals to serve as military judges, Congress has determined that these assign-

---

**2.** For example, if during Desert Shield/Storm a scud missile hit a barracks housing one or more judges from the services, replacements would be needed immediately. A service Judge Advocate General looking for qualified individuals might select an individual from the Court of Military Review. Likewise, if there was a heavy case load before the Court of Military Review, for example, a series of classified cases, the Judge Advocate General should have the flexibility of assigning a trial judge not involved with those cases to the appellate court.

ments be made by the Judge Advocate General of each service who has direct responsibility for military justice within his or her respective service.[3] Congress has implicitly recognized that the Judge Advocates General are uniquely situated to determine which officers are best qualified within their respective services to serve as both trial and appellate judges. Moreover, these same individuals have by necessity great flexibility to make these assignments[4] quickly in a combat environment where casualties or other exigencies may affect the military judiciary.

Second, with respect to establishing a system of checks and balances between the Executive and Legislative branches, it is difficult to see how the present system of assigning military judges jeopardizes that delicate balance. If anything, the creation by Congress in 1951 of the United States Court of Military Appeals, a federal civilian court subject to the Appointments Clause, which reviews decisions of the military judiciary, more than satisfies any concerns in that regard. *See* 64 Stat. 129. Additionally, effective August 1, 1984, Congress provided in Article 67(h)(1), UCMJ, 10 USC § 867(h)(1), now Article 67a, UCMJ, 10 USC § 867a (1989), that decisions of our Court are reviewable by the Supreme Court of the United States by writ of certiorari, Military Justice Act, Pub.L. No. 98–209, § 10(c)(2), 97 Stat. 1393, 1406, thereby providing the ultimate check on judicial decisions of the military justice system.

If there is dissatisfaction with the military justice system as it exists today, it can be changed or modified by the majoritarian process. That is, the elected representatives of Congress, in consultation with the Executive branch, have the power to make any necessary changes. But this Court must not, by judicial fiat, impose the procedures intended for a federal civilian judiciary upon the military under the guise of the Constitution. To do so would be to ignore the constitutional deference given to Congress by our Founding Fathers because of the realities and practicalities of national security exigencies.

### D. Special Deference

Based on the intent of the Framers, the Constitution, and Federal statute, the Supreme Court has given great deference to the authority of Congress and the President in military matters. The Supreme Court has repeatedly recognized the power of Congress to provide for military justice. Judge Grace in *United States v. Prive*, 35 MJ 569, 573–74 (CGCMR 1992), has listed some of those decisions as follows:

*Dynes v. Hoover,* 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1858) ("These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations....").

*Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 123, 18 L.Ed. 281 (1866) ("Congress has declared the kinds of trial [for offenses by soldiers] and the manner in which they shall be conducted....").

*Uniform Code of Military Justice,* 29 Tex.L.Rev. 651 (1951).

---

**3.** Article 26(c), Uniform Code of Military Justice, 10 USC § 826(c), provides: "The military judge of a general court-martial shall be designated by the Judge Advocate General, or his designee, of the armed force of which the military judge is a member...."

Article 66(a), UCMJ, 10 USC § 866(a), provides: "Each Judge Advocate General shall establish a Court of Military Review which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges."

*See also* Morgan, *The Background of the Uniform Code of Military Justice,* 6 Vand.L.Rev. 169 (1953); Comments, *Military Justice and the Constitution—Improvements Offered by the New*

**4.** Article 6(a), UCMJ, 10 USC § 806(a), states:

The assignment for duty of judge advocates of the Army, Navy, Air Force, and Coast Guard shall be made upon the recommendation of the Judge Advocate General of the armed force of which they are members. The assignment for duty of judge advocates of the Marine Corps shall be made by direction of the Commandant of the Marine Corps. The Judge Advocate General or senior members of his staff shall make frequent inspections in the field in supervision of the administration of military justice.

*Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974) ("This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society.... [T]he military has, again by necessity, developed laws and traditions of its own during its long history.")

*Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591, 609 (1975) ("The laws and traditions governing [military] discipline have a long history; ... they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress.")

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 66, 102 S.Ct. 2858, 2869, 73 L.Ed.2d 598 (1982) ("[T]he exercise by Congress and the Executive of the power to establish and administer courts-martial ... involves a constitutional grant of power that has been historically understood as giving the political Branches of Government extraordinary control over the precise subject matter at issue.")

In *United States v. Prive, supra* at 576, Judge Grace summarized the effect of these decisions on the present issue by paraphrasing a statement from *Northern Pipeline* as follows:

> [T]hese precedents [of the Supreme Court] "represent no broad departure from the constitutional command that" *appointments must be made in accordance with the Appointments Clause.* Rather, they reduce to a narrow situation not subject to that command, that "recogniz[es] a circumstance in which the grant of power to the Legislative and Executive Branches was historically and constitutionally so exceptional that the congressional assertion of power" *to designate military judges outside of the provisions of the Appointments Clause* "was consistent with, rather than threatening to, the constitutional mandate of separation of powers."

*See* 458 U.S. at 64, 102 S.Ct. at 2868 (emphasis added).

Judge Grace also relied on this statement from *Solorio v. United States,* 483 U.S. 435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987):

> Decisions of this Court after *O'Callahan* [*v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) ] have also emphasized that *Congress has primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military.* As we recently reiterated, " '[j]udicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged.' "

(Emphasis added and citations omitted.)

I agree with the Coast Guard Court of Military Review and "conclude that Congress, in legislating for the land and naval forces, may provide for the designation of judges within the military justice system in a manner not provided for in the Appointments Clause of the Constitution." 35 MJ at 577.

SULLIVAN, Chief Judge (dissenting):

I respectfully disagree with the lead opinion and Judge Crawford's separate opinion in this case. In my view the Constitution speaks clearly on the granted issue, and we are duty-bound to follow its supreme command. U.S. Const. art. VI. Military judges, both trial and appellate, are "inferior Officers" of the United States and must be appointed to their offices by "the President alone," or by this Court or one of the other "Courts of Law," or by the Secretary of Defense or one of the other "Heads of Departments." Art. II, § 2, para. 2, cl. 2. *See Freytag v. Commissioner of Internal Revenue,* 501 U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Appellant's military judges were not so appointed, but their status as *de facto* appointees might preclude reversal of his conviction. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982); *Buckley v. Valeo,* 424 U.S. 1, 142–

43, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976). Nevertheless, I must dissent to the majority's simple affirmance of this case. *Id.*

More particularly, I do not believe that Congress' broad power to make rules for the land and naval forces under Article I, § 8, clause 14 of the Constitution is unlimited such that the Appointments Clause can be considered *per se* inapplicable to military justice legislation. *See generally Mistretta v. United States*, 488 U.S. 361, 382, 109 S.Ct. 647, 660, 102 L.Ed.2d 714 (1989). (Even Congress' primary duty to make laws is limited by the constitutional prohibition against an ex post facto Law-*e.g.*, Art. I, § 9, para. 3). A contrary opinion in my view is extremely dangerous in that it upsets the delicate system of checks and balances provided in our Constitution to ensure the American way of government.

I also would hold that commissioning and promoting military officers by the President by and with the advice and consent of the Senate does not obviate the need for additional constitutional appointments of such persons for higher or more responsible offices both within and without the military department (*i.e.* military trial judge or appellate judge). There is no blanket "commissioned officer" exception to the Appointments Clause written in the Constitution, and the decision of the Supreme Court in *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), should not be broadly extended to create one for military officers who are simply "legally trained." In sum, consistent with my judicial philosophy of spurning judicial legislation, I also must reject the judicial constitution-making accomplished by the lead opinion in this case.

## I

### *The Granted Issue*

The issue raised by appellate defense counsel and granted review by this Court is as follows:

WHETHER APPELLANT'S COURT–MARTIAL LACKED JURISDICTION WHERE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION, AND WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW WAS WITHOUT POWER TO REVIEW THIS CASE WHERE ITS JUDGES WERE DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.

In this regard, I note that the judge in this trial was Major Edward F. Pesik, Jr., United States Marine Corps. He was certified in accordance with Article 26(b), Uniform Code of Military Justice, 10 USC § 826(b); sworn in accordance with Article 42(a), UCMJ, 10 USC § 842(a); and detailed to this case.[1] The appellate military judges in this case were Senior Judge James A. Freyer, a Navy Captain; Senior Judge Richard A. Strickland, a Marine Colonel; and Judge James E. Orr, a Navy Captain. These judges constituted Panel No. 1 of the Court of Military Review, and they reviewed appellant's case in accordance with that court's internal rules.

The issue of law raised by appellate defense counsel and granted by this Court focuses on the "designat[ion]" of the military judge who tried his case and the "designat[ion]" of the military appellate judges who heard his appeal. Appellant does not contend that these designations were accomplished in violation of the Uniform Code of Military Justice. Instead, he contends that they were not accomplished in accordance with the Appointments Clause of the United States Constitution. Art. II, § 2, para. 2, cl. 2. Relying heavily on the recent Supreme Court decision in *Freytag v. C.I.R.*, *supra*, he asserts that military judges "are 'Officers of the United States'" who must be "appointed as such by the President, the Courts of Law, or the Head of a Department." Final Brief at 10. Finally, he asserts that the designation of

---

1. Appellant represents without opposition that Major Pesik was a "General Court–Martial qualified" judge and the Sierra Judicial Circuit's Chief Military Judge.

these military judges by the Judge Advocate General of the Navy fails to satisfy this constitutional appointment standard.

## II

### The Statutes Establishing The Military Judge

A necessary step in resolving the granted issue is to understand the statutes which create the military trial and appellate judges and provide for persons to fill these judicial positions. At the outset I note that Congress has not expressly provided that a person be "appointed" a military trial judge or appellate judge. However, in the version of the Uniform Code of Military Justice enacted in 1950, Congress did provide for "appoint[ment]" of a law officer, the statutory predecessor of the military judge, by appropriate convening authorities. *See* Art. 26(a), UCMJ, 50 USC § 590(a), recodified in 10 USC § 826(a) (1956). Furthermore, in the 1950 Code, Congress provided for "appoint[ment]" of judges of this Court "by the President, by and with the advice and consent of the Senate." Art. 67(a), UCMJ, 50 USC § 654(a), recodified in 10 USC § 867(a)(1956); *see* Art. 142(b)(1), UCMJ, 10 USC § 942(b)(1)(1989). Despite Congress' obvious familiarity with the appointment terminology, it chose to create the military judge and provide for filling this government position with somewhat less direct language.[2]

I first note that, since 1969, Article 26(b) had provided that "[a] military judge shall be a commissioned officer of the armed forces." 10 USC § 531 further provides:

### § 531. Original appointments of commissioned officers

(a) *Original appointments in the grades* of second lieutenant through colonel in the Regular Army, Regular Air Force, and Regular Marine Corps and in the grades of ensign through captain in the Regular Navy *shall be made by the President, by and with the advice and consent of the Senate.*

(Emphasis added.) *See also* 10 USC § 593 (appointment in reserves in commissioned grades below lieutenant colonel and commander by President alone).

The qualifications for original appointment are also statutorily established:

### § 532. Qualifications for original appointment as a commissioned officer

(a) Under regulations prescribed by the Secretary of Defense, an original appointment as a commissioned officer (other than as a commissioned warrant officer) in the Regular Army, Regular Navy, Regular Air Force, or Regular Marine Corps may be given only to a person who—

(1) is a citizen of the United States;

(2) is able to complete 20 years of active commissioned service before his fifty-fifth birthday;

(3) is of good moral character;

(4) is physically qualified for active service; and

(5) has such other special qualifications as the Secretary of the military department concerned may prescribe by regulation.

Article 26(b)(1969) also provides that a military judge must be "a member of the bar of a Federal court or a member of the bar of the highest court of a State." This requirement for legal training is somewhat less stringent than the requirement for detail as trial counsel or defense counsel at a

---

**2.** What is an "appointment" for purposes of the Appointments Clause is a substantial constitutional question concerning separation of powers which implicates all three branches of our Government. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 155, 2 L.Ed. 60 (1803). *See generally Buckley v. Valeo,* 424 U.S. 1, 122–24, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Moreover, in *Auffmordt v. Hedden,* 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890), the Supreme Court

clearly held that Congress' use of the word "select" rather than "appoint" was but one factor to be considered in determining whether the Appointments Clause applied. Finally, in *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), the Supreme Court impliedly held that designation of officers for additional duty requires compliance in some manner with the Appointments Clause.

general court-martial. *See* Art. 27(b), UCMJ, 10 USC § 827(b), which states:

(b) Trial counsel or defense counsel detailed for a general court-martial—

(1) must be a *judge advocate who is a graduate of an accredited law school* or is a member of the bar of a Federal court or of the highest court of a State; or must be a member of the bar of a Federal court or of the highest court of a State; and

(2) must be certified as competent to perform such duties by the Judge Advocate General of the armed force of which he is a member.

(Emphasis added.)

I next note that Article 26(b) (1969) provides that a military judge must be "certified to be qualified for duty as a military judge by the Judge Advocate General of the armed force of which such military judge is a member." The standards for certification are not provided by statute, and there is no statutory requirement that a military judge be designated a member of the Judge Advocate General's Corps or a Marine Corps judge advocate. However, as a practical matter, military judges to be certified as qualified normally would have experience as a trial or defense counsel under Article 27(b). This statute alternatively requires designation as a "judge advocate."

In fact, the military judge who presided over this court-martial was a Marine judge advocate. *See* NAVMC P–1005, Officers on Active Duty in the Marine Corps at 1–43 (1 Oct.1989, 48th Rev.). 10 USC § 5587a provides:

§ 5587a. **Regular Marine Corps: judge advocates**

*With the approval of the Secretary of the Navy,* any regular officer on the active-duty list of the Marine Corps who is qualified under section 827(b) of this title *may, upon his application, be designated as a judge advocate.*

(Emphasis added.)

Moreover, two of the appellate military judges who heard his appeal before the Court of Military Review were members of

the Navy Judge Advocate General's Corps. 10 USC § 5150 provides:

§ 5150. **Staff corps of the Navy**

(a) *The staff corps of the Navy are—*

(1) the Medical Corps;

(2) the Dental Corps;

(3) *the Judge Advocate General's Corps;*

(4) the Chaplain Corps; and

(5) such other staff corps as may be established by the Secretary of the Navy under subsection (b).

(b)(1) The Secretary of the Navy may establish staff corps of the Navy in addition to the Medical Corps, the Dental Corps, the Judge Advocate General's Corps, and the Chaplain Corps. *The Secretary may designate commissioned officers in, and may assign members to, any such staff corps.*

(Emphasis added.)

As indicated above, designation as a judge advocate does not determine where or when a commissioned officer serves this duty. Article 6, UCMJ, 10 USC § 806 (1984), further comments on the assignment for duty of judge advocates, as follows:

§ 806. Art. 6. **Judge advocates and legal officers**

(a) The *assignment for duty of judge advocates* of the Army, *Navy,* Air Force, and Coast Guard *shall be made upon the recommendation of the Judge Advocate General of the armed force of which they are members. The assignment for duty of judge advocates of the Marine Corps shall be made by direction of the Commandant of the Marine Corps.* The Judge Advocate General or senior members of his staff shall make frequent inspections in the field in supervision of the administration of military justice.

(Emphasis added.) The legislative history makes clear that Congress intended the Judge Advocate General of each service to play a substantial initiating role in the as-

signment process while reserving to military personnel authorities the final say.[3] *See* Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 898–901 (1949), *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1950).

Article 26(c) (1969) also provides that a "military judge of a general court-martial *shall be designated by the Judge Advocate General,* or his designee, of the armed force of which the military judge is a member *for detail* in accordance with regulations prescribed under subsection (a)." (Emphasis added.) The language of designation is not new (10 USC § 8067) and generally refers to "a special duty classification." *See* 1967 U.S.Code Cong. & Admin. News 2113, 2114. Again the actual assignment of a designated military judge to Navy–Marine Corps Trial Judiciary is impliedly left to military personnel authorities. *See* SECNAVINST 5813.6C (13 April 1979).[4]

**3.** 10 USC § 5013(g) provides:

(g) The Secretary of the Navy may—
(1) assign, detail, and prescribe the duties of members of the Navy and Marine Corps and civilian personnel of the Department of the Navy;
(2) change the title of any officer or activity of the Department of the Navy not prescribed by law; and
(3) prescribe regulations to carry out his functions, powers, and duties under this title.
10 USC § 5131 creates the Bureau of Naval Personnel and 10 USC § 5132 empowers it as follows:

§ 5132. **Bureaus: distribution of business; orders; records; expenses**

(a) Except as otherwise provided by law, the business of the executive part of the Department of the Navy shall be distributed among the bureaus as the Secretary of the Navy considers expedient and proper.
(b) Each bureau shall perform its duties under the authority of the Secretary, and its orders are considered as coming from the Secretary.
(c) Under the Secretary, each bureau has custody and charge of its records and accounts.
(d) Each bureau shall furnish to the Secretary estimates for its specific, general, and contingent expenses.

Finally, Article 26(a) (1969), in providing for detailing military judges to hear particular cases, states:

(a) A military judge shall be detailed to each general court-martial. *Subject to regulations of the Secretary concerned,* a military judge may be detailed to any special court-martial. The Secretary concerned shall prescribe regulations providing for the manner in which military judges are detailed for such courts-martial and for the persons who are authorized to detail military judges for such courts-martial. The military judge shall preside over each open session of the court-martial to which he has been detailed.

(Emphasis added.) As noted in *United States v. Graf,* 35 MJ 450 (CMA 1992), these regulations provide that detailing will be accomplished by the Chief Judge, the circuit military judge, or the circuit military judge's designee. *See* §§ 0120a(1)(1987); 0130a(1)(1990), Manual of the Judge Advocate General of the Navy.

For members of the Marine Corps, these powers are vested in the Commandant of the Marine Corps. *See* 10 USC § 5043(e)(3).

**4.** 6. **Organization.** The Navy–Marine Corps Trial Judiciary is a naval activity as that term is defined in [U.S. Navy Regulations, 1973]. It is composed of the Office of the Chief Judge of the Navy–Marine Corps Trial Judiciary and such Judicial Circuits and their Branch Offices as may be established by the Judge Advocate General. The Judge Advocate General may also establish Judicial Areas, each consisting of two or more Judicial Circuits, for the purpose of providing an intermediate level of supervision within the Trial Judiciary. Expansion of the Navy–Marine Corps Trial Judiciary will come from current manpower resources as determined by the Chief of Naval Operations, the Commandant of the Marine Corps, and the Judge Advocate General, acting in coordination. The Marine Corps Special Court–Martial Judiciary is disestablished, and its members are members of the Navy–Marine Corps Trial Judiciary.

\*   \*   \*

8. **Authority Over Organization, Functions and Administration.** The Judge Advocate General is authorized to organize, administer, assign, and reassign functions to the Navy–Marine Corps Trial Judiciary and personnel attached thereto in accordance with [10 USC § 826 et. seq.].

In sum, the President and the Senate make a person a commissioned officer; the Secretary of the Navy makes that commissioned officer a judge advocate; the Judge Advocate General qualifies and classifies that judge advocate as a military judge; the Chief of Naval Personnel or the Commandant of the Marine Corps assigns him a duty station; and the Secretary of the Navy provides regulations for his detail to a particular case within that duty assignment.

### III

### *Constitutional Tension*

In view of these empowering statutes, it is now appropriate to turn to the United States Constitution. *See Dynes v. Hoover,* 61 U.S. (20 How.) 65, 61 U.S. 65, 15 L.Ed. 838 (1858). Article I, § 8 of the Constitution provides:

The Congress shall have Power

\* \* \*

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces[.]

In addition, I note that this same section of the Constitution further provides:

The Congress shall have Power

\* \* \*

To constitute Tribunals inferior to the supreme Court;

\* \* \*

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Clearly, these constitutional grants of authority are sufficient to provide for the above-noted statutory establishment of a military justice system with military trial and appellate judges. *See Solorio v. United States,* 483 U.S. 435, 441, 107 S.Ct. 2924, 2928, 97 L.Ed.2d 364 (1987); *Schlesinger v. Councilman,* 420 U.S. 738, 757–58, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975). *See also Rostker v. Goldberg,* 453 U.S. 57, 65–66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981).

I also note the operative provisions of the Constitution which appellant asserts are applicable to the appointment of military judges. Article II states in pertinent part:

Section 2. The President shall be Commander in Chief of the Army and Navy of the United States....

*[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint* Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and *all other Officers of the United States, whose Appointments are not herein otherwise provided for and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.*

(Emphasis added.) Article II further states:

Section 3. He shall ... take Care that the Laws be faithfully executed, and *shall Commission all the Officers of the United States.*

(Emphasis added.)

In view of these provisions of the Constitution, three distinct but nonetheless related issues are raised which this Court must decide. First, can Congress create the position of military judge and provide for its filling under Article I, § 8 of the Constitution without regard to the Appointment Clause of Article II, § 2 of the Constitution? (*See* Parts IV and V, below.) Assuming it cannot, what does Article II, § 2 of the Constitution require for a proper constitutional appointment to the office of military judge? (*See* Part VI below.) Finally, does the statutory system of designation/detail provided by Congress for military judges meet the above constitutional requirements? (*See* Part VII below.)

IV

*The Scope of the Constitutional Power of Congress in Military Justice*

It is beyond cavil that Congress has extremely broad powers to legislate in military matters generally and military justice matters in particular. Moreover, it is also quite clear that the Supreme Court has afforded great deference to Congress' decisions in this regard. The Coast Guard Court of Military Review has exhaustively summarized the relevant Supreme Court cases supporting these assertions in its decision in *United States v. Prive*, 35 MJ 569, 573–75 (1992).

Despite these pronouncements, the Supreme Court has also made very clear that its deference to Congress in military matters is not absolute. *Rostker v. Goldberg, supra* at 67–68, 101 S.Ct. at 2653, states:

None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause, *see Ex parte Milligan*, [71 U.S. ( ] 4 Wall. [ ) ] 2, 18 L.Ed. 281 (1866); *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 156 [40 S.Ct. 106, 108, 64 L.Ed. 194] (1919), but the tests and limitations to be applied may differ because of the military context. We of course, do not abdicate our ultimate responsibility to decide the constitutional question, but simply recognize that the Constitution itself requires such deference to congressional choice. *See Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. [94] at 103 [93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973) ]. In deciding the question before us we must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch.

Moreover, in *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976), the Supreme Court had earlier held that Congress' military justice powers were not totally independent of the rest of the Constitution. According to then-Justice Rehnquist:

We recognize that plaintiffs, who have either been convicted or are due to appear before a summary court-martial, may be subjected to loss of liberty or property, and consequently are entitled to the due process of law guaranteed by the Fifth Amendment.

However, whether this process embodies a right to counsel depends upon an analysis of the interests of the individual and those of the regime to which he is subject. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974).

In making such an analysis, we must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial. As we held in *Burns v. Wilson*, 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953):

"[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers especially entrusted that task to Congress." (Footnote omitted.)

425 U.S. at 43, 96 S.Ct. at 1291. *See also Solorio v. United States*, 483 U.S. at 451 n.18, 107 S.Ct. at 2933 n. 18.

A question remains, however, whether Congress' power to make rules for the government and regulation of the Army and Navy is also limited or restricted by Article II, § 2, paragraph 2, clause 2 of the Constitution. The Coast Guard Court of Military Review in *United States v. Prive, supra*, has held that the Framers of the Constitution did not intend to include Congress' military justice power within the scope of the appointment clause. Relying on *Northern Pipeline Construction Co. v.*

*Marathon Pipe Line Co.*, 458 U.S. at 63–70, 102 S.Ct. at 2867–71, it asserts that the military justice system is one of those "narrow situations ... in which the grant of power to the Legislative and Executive Branches was historically and constitutionally so exceptional that the congressional assertion of a power to create legislative courts was consistent with, rather than threatening to, the constitutional mandate of separation of powers." *Id.* at 64, 102 S.Ct. at 2868 (plurality opinion). *See* 35 MJ at 575–76.

I disagree with the Coast Guard Court of Military Review for several reasons. First, the Supreme Court in *Northern Pipeline* held that the bankruptcy courts were not legislative courts properly excepted from compliance with the requirements of Article III of the Constitution. While it stated that courts-martial created by Congress under Article I, § 8 of the Constitution were legislative courts, and thus were not affected by Article III of the Constitution, it went no further. The additional leap taken by the Coast Guard Court of Military Review in extending this decision into the area of Article II and the Appointments Clause in disregard of the plain language of the Constitution is simply not justified. *See Mimmack v. United States*, 97 U.S. 426, 437, 24 L.Ed. 1067 (1878); *see also Wood v. United States*, 107 U.S. 414, 417, 2 S.Ct. 551, 554, 27 L.Ed. 542 (1883); *Blake v. United States*, 103 U.S. 227, 232, 26 L.Ed. 462 (1881); 30 Op.Atty.Gen. 177, 180 (1913); 4 Op.Atty.Gen. 603, 610 (1847). *See generally* 4 P. Kurland and R. Lerner, *The Founders' Constitution* 31–38, 98 (1987).

Second, the principle of separation of powers disputed in *Northern Pipeline* was between the congressional and judicial branches of our government. However, the Supreme Court in *Northern Pipeline* clearly recognized that the Constitution's exceptional plenary grant of power over the Nation's armed forces was to both the Legislative and Executive Branches of our Government. 458 U.S. at 71, 102 S.Ct. at 2871. Accordingly, the *ratio decidendi* employed by the Supreme Court in *Northern Pipeline* cannot be logically applied to

a dispute between branches of the government which *both* historically and constitutionally share that very power. *See generally* E. Corwin, *The President: Office and Powers (1787–1984)* at 296 (5th rev. ed. 1984).

Finally, the Supreme Court in *Freytag v. C.I.R.*, 501 U.S. ——, 111 S.Ct. 2631, clearly recognized *two* concerns of the Framers of the Constitution in adopting the Appointments Clause·of the Constitution. Justice Blackmun said:

> The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political. Our separation-of-powers jurisprudence generally focuses on the danger of one Branch's aggrandizing its power at the expense of another Branch. *See Mistretta v. United States*, 488 U.S. 361, 382, 109 S.Ct. 647, 659, 102 L.Ed. 2d 714 (1989). The Appointments Clause not only guards against this encroachment *but also preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power.*

501 U.S. at ——, 111 S.Ct. at 2638 (emphasis added).

More particularly, he later said:

> We cannot accept the Commissioner's assumption that every part of the Executive Branch is a department the head of which is eligible to receive the appointment power. *The Appointments Clause prevents Congress from distributing power too widely by limiting the actors in whom Congress may vest the power to appoint. The Clause reflects our Framers' conclusion that widely distributed appointment power subverts democratic government. Given the inexorable presence of the administrative state, a holding that every organ in the Executive Branch is a department would multiply indefinitely the number of actors eligible to appoint. The Framers recognized the dangers posed by an excessively diffuse appointment power and rejected efforts to expand*

*that power. See Wood,* at 79–80. So do we. For the chief judge of the Tax Court to qualify as a "Head of a Department," the Commissioner must demonstrate not only that the Tax Court is a part of the Executive Branch but also that it is a department.

*Id.* at ——, 111 S.Ct. at 2642 (emphasis added). This constitutional concern with Congress' excessive diffusion of the Executive's appointing power is simply not addressed by the *Northern Pipeline* rationale.

## V

*The Scope of the Constitutional Power of the Executive to Appoint Inferior Officers of the United States*

The next inquiry concerns the actual scope of the Presidential appointment power. The general adage is that Congress creates the offices and the President appoints the necessary officers to fill them. *See generally* L. Tribe, *American Constitutional Law* 244 (2d ed. 1988). However, the words of the Constitution more particularly narrow the positions in the Federal government which are included within the constitutional appointment process.

Article II of the Constitution states:

Section 1. The executive Power shall be vested in a President of the United States of America....

Section 2. The President shall be Commander in Chief of the Army and Navy of the United States....

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and *he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint* Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, *and all other Officers of the United States,* whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may be Law vest the Appointment *of such inferior Officers,* as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

Section 3. He shall ... take Care that the Laws be faithfully executed, and *shall Commission all the Officers of the United States.*

(Emphasis added.)

In light of these provisions, the first question which arises is who are "all other Officers of the United States" or "such inferior Officers, as they think proper" within the meaning of Article II of the Constitution. The Supreme Court in *United States v. Germaine,* 99 U.S. 508, 510, 25 L.Ed. 482 (1879), defined such officers as "all persons who can be said to *hold an office* under the government about to be established under the Constitution...." (Emphasis added.) More recently, the Supreme Court spoke particularly on the office holders who could be considered "Officers of the United States," as follows:

We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine, supra,* is a term intended to have substantive meaning. *We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article.*

*Buckley v. Valeo,* 424 U.S. at 125–26, 96 S.Ct. at 685 (emphasis added). *See Freytag v. C.I.R.,* 501 U.S. at ——, 111 S.Ct. at 2640. In this light, a critical question in this case is whether a military judge is an Officer of the United States.

I note that this Court most recently in *United States v. Graf,* 35 MJ 450, 465 (CMA 1992), and *United States v. Mabe,* 33 MJ 200 (CMA 1991), analyzed the statutes

and regulations concerning the military judge and concluded that "the Uniform Code of Military Justice contemplates that a military judge be a real judge as commonly understood in the American legal tradition." 35 MJ at 465. In addition, I note that in *Freytag v. C.I.R., supra,* the Supreme Court expressly held that a special trial judge established by Congress "as an aide to [a] Tax Court judge" is "an 'inferior Officer' whose appointment must conform to the Appointments Clause." 501 U.S. at ——, 111 S.Ct. at 2640.

The Supreme Court in *Freytag* articulated its reasoning for reaching this conclusion, as follows:

The Commissioner reasons that special trial judges may be deemed employees in subsection (b)(4) cases because they lack authority to enter a final decision. But this argument ignores the significance of the duties and discretion that special trial judges possess. The office of special trial judge is "established by Law," Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute. *See Burnap v. United States,* 252 U.S. 512, 516–517, 40 S.Ct. 374, 376–377, 64 L.Ed. 692 (1920); *United States v. Germaine,* 99 U.S. 508, 511–512, 25 L.Ed. 482 (1879). These characteristics distinguish special trial judges from special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute. *Furthermore, special trial judges perform more than ministerial tasks. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the special trial judges exercise significant discretion.*

Even if the duties of special trial judges under subsection (b)(4) were not as significant as we and the two courts have found them to be, our conclusion would be unchanged. Under §§ 7443A(b)(1), (2), and (3), and (c), the chief judge may assign special trial judges to render the decisions of the Tax Court in declaratory judgment proceedings and limited-amount tax cases. The Commissioner concedes that in cases governed by subsections (b)(1), (2), and (3), special trial judges act as inferior officers who exercise independent authority.

501 U.S. at ——, 111 S.Ct. at 2640 (emphasis added).

The position of military judge is established by law. *See* Arts. 26 and 66, UCMJ, 10 USC §§ 826 and 866, respectively. The duties and functions of a person in this position are also established by statute. *See* Arts. 26, 39, 51, and 66, UCMJ, 10 USC §§ 826, 839, 851, and 866, respectively. The Code authorizes military judges to hear and determine motions on various pretrial, trial, and posttrial matters (*see* Art. 39(a)); rule on all questions of law and interlocutory questions at courts-martial (Art. 51(b)); and impose Federal convictions up to and including life in prison, punitive separations from the service, and substantial financial penalties (Arts. 16(1)(B) and 18, UCMJ, 10 USC §§ 816(1)(B) and 818, respectively). A judge sitting with court members also instructs them on the various matters necessary to reach appropriate findings and sentences, even in capital cases where a servicemember's life is at stake. (Art. 51(c)). These are not ministerial tasks but judicial ones calling for the exercise of significant discretion. *See United States v. Graf,* 35 MJ 450; *United States v. Cole,* 31 MJ 270, 272 (CMA 1990). Finally, judges exercise independent authority. Art. 37, UCMJ, 10 USC § 837. *See United States v. Graf, supra.* In my view, the military trial judges and appellate military judges are "Officers of the United States," as provided for in Article II, § 2 of the Constitution.

## VI

### *The Constitutional Requirements for a Valid Appointment*

My next inquiry concerns the particular requirements provided in the Constitution

for a valid appointment of "Officers of the United States." The answer to this question in large part depends on whether a military judge is one of "all other Officers of the United States" or is one of the "inferior Officers" generally denominated in Article II, § 2. *See United States v. Germaine,* 99 U.S. at 509–10, 25 L.Ed. at 483. *See generally* R. Rotunda, J. Nowak, and J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 9.4 at 504–05 (1986). In light of the Supreme Court's characterization of a special tax court judge as an inferior officer in *Freytag v. C.I.R., supra,* I have no reservations in concluding that a military trial judge and military appellate judge are "inferior Officers" of the United States within the meaning of Article II, § 2. *See also Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612.

In this light a military judge need not be appointed by the President by and with the Advice and Consent of the Senate. However, it is required that he be appointed by "the President alone," a Court of Law, or a Head of a Department. *Freytag v. C.I.R., supra.* Nevertheless, the lead opinion and the Navy–Marine Corps Court of Military in *United States v. Coffman,* 35 MJ 591 (1992), have held that this constitutional requirement is satisfied by a military officer's earlier commission and succeeding promotions by the President with the Advice and Consent of the Senate. Relying on *Shoemaker v. United States, supra,* they assert that no further appointment by the President, a Court of Law, or a Head of a Department is required to permit a "legally trained" military officer to constitutionally assume the office of military trial or appellate judge.[5]

The Navy–Marine Corps Court of Military Review articulated its rationale for its holding in *Coffman* as follows:

> Assuming *arguendo* that [the Appointments Clause] applies to military judges, the fact is that all military judges must be commissioned officers of the armed forces of the United States and, as such,

have by law already been *appointed* by the President. Art. 26(b), UCMJ, 10 USC § 826(b); 10 USC §§ 101(4), 101(15), 531, 593, 624, 5001(6), 5912. Depending upon grade, component, and presence on the active-duty list, some of these commissioned officers by law must also have had their appointments confirmed by and with the advice and consent of the Senate. 10 USC §§ 531, 593, 624, 5912. All military judges must be lawyers. Art. 26(b), UCMJ, 10 USC § 826(b). The duties these commissioned officers are *detailed* to perform as military judges are within the sphere of their official duties and are germane to the office they already hold. A second appointment from the President to a commissioned officer to perform the duties of a military judge is simply not required. *Cf. Shoemaker v. United States,* 147 U.S. 282, 299–301, 13 S.Ct. 361, 390–391, 37 L.Ed. 170, 185 (1892) (Army officers (engineers) were not required to obtain a second appointment to perform duties on a commission created by Congress to acquire lands for a park). Accordingly, we conclude the appellant's first assignment of error is also without merit.

35 MJ at 592.

The lead opinion more particularly posits two reasons why no further constitutional appointment of military judges is required by the Appointments Clause. First, it concludes that the office of military judge is not a "new office," so no additional appointment is required under *Shoemaker v. United States, supra.* Assuming it is a new office, the opinion holds that the germaneness of its duties to those duties previously performed by "legally trained military officers" also precludes the need for a second appointment under *Shoemaker.* I disagree.

The lead opinion concedes that a military judge is an Officer of the United States. Moreover, it notes that the new powers of this officer were previously shared by the members of a court-martial, its president,

---

5. This argument on its face fails to justify appointment of civilians to the Court of Military

Review as authorized by Article 66, Uniform Code of Military Justice, 10 USC § 866.

and its law officer. Thus, Congress did not increase the power and duties of "an existing office" but created a new office to which these powers were transferred. It is the removal of these powers and duties from commissioned military officers, not their addition thereto, which renders inapposite the lead opinion's no-"new-office" argument.

6. The establishment of the military judge was not the only change accomplished by the legislation of 1968. Also, for the first time in the history of American military justice, a servicemember could be tried and sentenced by a single military officer without court members in serious non-capital cases. Art. 16(1)(B), UCMJ, 10 USC § 816(1)(B). *See* H. Moyer, *Justice and The Military* § 2–620 at 536 (1972); Douglass, *The Judicialization of Military Courts,* 22 Hast. L.J. 213, 220 (1971).

Representative Philbin commented on the reason for this bill as follows:

The need for this bill has become acute because of the increased size of our Armed Forces resulting from the military activity in Southeast Asia. Besides the savings in time and manpower afforded by the bill, the bill provides meaningful benefits and protections to the accused.

The enactment of this legislation will permit the procedure for trials by special and general courts-martial to conform more closely with the procedure used in the trial of criminal cases in the U.S. district courts and will enhance the prestige and effectiveness of the law officer, whose name is changed by the bill to "military judge," so that his judicial stature and authority in the courtroom will more closely approximate that of a civilian trial judge. The bill allows the military judge to rule finally on certain procedural matters, such as motions for findings of not guilty, on which he now may be overruled by the court members who are untrained in the law. The bill provides for pretrial and posttrial sessions to be held by the military judge without the presence of the court panel for the purpose of deciding procedural questions. The bill provides for trial in special and general court-martial by a military judge alone without court members if the accused requests and the request is approved by the military judge. *These last two provisions are expected to save innumerable man-hours of line officers who would otherwise be required to be in attendance at courts-martial, as well as improving the internal efficiency of the justice system.*

\* \* \*

*The enactment of this bill will be the most significant advance in the field of military justice since the enactment of the Uniform Code of Military Justice in 1951.*

I also find that the lead opinion grossly misapprehends the nature of the duties of a military judge and his contribution to military justice. The creation of the military judge in 1969 was a watershed event because it introduced for the first time, statutorily, *a professional judiciary* at courts-martial.[6] S.Rep. No. 1601, 90th Cong., 2d Sess. 3, 14 (1968). *See* Ervin, *The Military*

114 Cong.Rec. 30563–64 (1968) (emphasis added).

Representative Bennett, a central figure in the development of this legislation, made this statement regarding the 1968 legislation:

The need for this bill has become acute because of the increased size of our Armed Forces resulting from our present military activity in Vietnam. The bill provides meaningful benefits and protections to the accused, as well as streamlining procedures. The bill contains the following provisions, which are designed to increase the fairness of the military justice system: First, the accused must be afforded the right to be defended by a qualified lawyer at special courts-martial—heretofore such a right only existed in the case of general courts-martial; second, before a bad conduct discharge can be adjudged at a special court-martial, the accused must be represented by a qualified lawyer and the proceedings must be conducted by a "military judge"—a term I will discuss below—except where physical conditions or military exigencies prevent one from being obtained; third, the bill extends the time in which the accused can petition for a new trial from 1 to 2 years; and fourth, an accused faced with trial at summary court-martial can object to such an informal trial, at which time the convening authority must bring charges at a special or general court-martial or dismiss them.

*The enactment of H.R. 15971 will permit the procedure for trials in the military to conform more closely to the procedures used in the Federal courts. The bill also enhances the prestige and effectiveness of the law officer, whose name is changed to "military judge." The role of the "military judge" will closely approximate that of a civilian trial judge:* he will rule finally on certain procedural matters and will hold open pretrial and posttrial sessions without the presence of the court for the purpose of deciding procedural questions. An accused can request a special and general court-martial by a "military judge" alone.

The bill changes the name of the intermediate appellate agencies in the military from boards of review to courts of military review. The bill requires that the judges of these courts and of courts-martial be part of an independent judiciary. In addition, the bill authorizes a military form of release on bail

*Justice Act of 1968*, 45 Mil.L.Rev. 77, 83, 88–91 (1969). *See generally* Ross, *The Military Justice Act of 1968: Historical Background*, 23 JAG.J. 125 (1969). In this context, a holding that this office is new is an understatement.

Turning to the lead opinion's "germane duties" rationale, I also find its application in the present case unacceptable. *Shoemaker v. United States, supra,* is an exception to normal Appointments Clause practice, and a very narrow one at that. The lead opinion's extension of that case beyond its facts to permit the blanket investing of "legally trained" military officers with the office of military judge without compliance with the Appointments Clause is simply unprecedented. Strictly speaking, such an approach might be appropriate only if the "legally trained" military officers also held a specific presidentially appointed military justice office such as the Judge Advocate General of the Navy. *See* 10 USC § 5148.[7] Otherwise, the lead opinion's general-duties analysis, at least in my view, constitutes judicial activism.

In *Shoemaker*, the Supreme Court considered the devolution of additional duties not on commissioned military officers in general or on commissioned military engineering officers. Instead, they devolved on military officers already holding a specific military or civilian office requiring a presidential appointment. *See* Thian, *Legislative History of General Staff of the Army of the United States* 3, 485 (1901). *See generally* Hoeppel v. United States, 85 F.2d 237, 241 (D.C.Cir.1936). One Rock Park Creek Commission member who was a military officer had been previously appointed by the President to the Office of the Chief of Engineers of the United States Army. *See* R.S. §§ 1094, 1151, and 1193 (1878), and 17 Op. Atty. Gen. 2, 3 (1881); *see generally* 1 Stat. 749 (1799) and 20 Stat. 151, § 13 (1878); *see also* 10 USC § 3036 (1956). The second, also a military officer, had previously been "detailed" by the President as the Engineer Commissioner for the District of Columbia. *See* Ch. 180 § 2, 20 Stat. 103 (1878); 26 Stat. 1113 (1890); *see also* 10 USC § 3534 (1956). Thus, the additional "germane" duty of membership on the Rock Creek Park Commission cannot be simply said to have generally devolved on a diffused pool of com-

---

pending appeal, the need for which has been pointed out in several recent cases.

> *The importance of this legislation cannot be overstated. It is particularly needed in Vietnam, as has been pointed out by General Westmoreland; for under the bill line officers will be free from the necessity of serving as court members in many cases; and many previously wasted man-hours will be saved because of streamlined procedures.*
>
> I think it is most significant that the House of Representatives, which fathered the Uniform Code of Military Justice, also initiated the action on this legislation and now has the opportunity to put the capstone on it. *The enactment of H.R. 15971 will be the most significant advance in the field of military justice since enactment of the Uniform Code of Military Justice. I heartily recommend the House approve the Senate amendments.*

114 Cong.Rec. 30565 (1968) (emphasis added).

**7.** Neither of the two cases cited in *Shoemaker v. United States,* 147 U.S. 282, 301, 13 S.Ct. 361, 391, 37 L.Ed. 170 (1893), supports a "commissioned officer" exception to the Appointments Clause or its general-military-duty rationale as created by the lead opinion.

The petitioner in *Smith v. Whitney,* 116 U.S. 167, 6 S.Ct. 570, 29 L.Ed. 601 (1886), was an officer of the Navy who was later *appointed by the President by and with the consent of the Senate,* as the "chief of the bureau of provisions and clothing and pay-master general in the department of the navy, with the relative rank of commodore." *Id.* at 168, 6 S.Ct. at 570.

The petitioner in *Wales v. Whitney,* 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 577 (1885), was an officer in the Navy who *was later appointed by the President, by and with the consent of the Senate* as "chief of the bureau of medicine and surgery in the department of the navy," which office carried the additional title of "surgeon general of the navy." *Id.* at 569, 5 S.Ct. at 1052. *See* 10 USC § 5137, Historical and Revision Notes, R.S. 421 and 426.

The Supreme Court's holding that these military officers could be court-martialed for offenses under the Articles for the Government of the Navy does not logically suggest that an additional presidential appointment was not required for their assumption of their more particular civil or military offices.

missioned officers or commissioned officers with engineering training.

Second, the *Shoemaker* decision makes clear that this extraordinary application of the Appointments Clause rests on a conclusion that the new additional duties are "germane to the offices already held by them." 147 U.S. at 301, 13 S.Ct. at 391. More particularly, the Supreme Court there said:

It is true that it may be sometimes difficult to say whether a given duty, devolved by statute *upon a named officer,* has regard to the civil or military service of the United States. *Wales v. Whitney,* 114 U.S. 564, 569, 5 S.Ct. 1050 [1052]; *Smith v. Whitney,* 116 U.S. 167, 179, 181, 6 S.Ct. 570 [576, 577]. But, in the present case, the duty which the military officers in question were called upon to perform cannot fairly be said to have been dissimilar to, or outside of, the sphere of, their official duties.

147 U.S. at 301, 13 S.Ct. at 391 (emphasis added). The additional duties as a member of the Rock Creek Park Commission were particularly related to the military officers' office as Chief of Engineers of the United States Army and office as Engineer Commissioner for the District of Columbia. Clearly neither duty as engineer nor training as an engineer sufficed.

Appellate government counsel and various amici have also asserted that the duties of a military judge are "germane" to the various powers of a commissioned officer under the Uniform Code of Military Justice. These include the power to "quell quarrels, frays, and disorders" (Art. 7(c), UCMJ, 10 USC § 807(c)); make arrests (Art. 9(b), UCMJ, 10 USC § 809(b)); serve as an investigating officer (Art. 32, UCMJ, 10 USC § 832); impose non-judicial punishments (Art. 15, UCMJ, 10 USC § 815); and serve as court-martial members at special courts-martial without a military judge (Art. 25(a), UCMJ, 10 USC § 825(a)). I do not consider a military judge's judicial duties similar to or within the sphere of the general military justice responsibilities of a line officer. Moreover, the latter duties

are collateral and irregular and, therefore, also lack the specificity-of-office considered in *Shoemaker.*

Finally, the available lower court decisions applying *Shoemaker* simply do not support a broad military commission-promotion exception to the Appointments Clause for legally trained officers. The Court of Appeals for the Eleventh Circuit applied *Shoemaker* in the context of the "Investigating Committee of the Judicial Council of Eleventh Circuit." *See In the Matter of Certain Complaints Under Investigation,* 783 F.2d 1488 (11th Cir.1986). It noted that the members of this committee were *sitting federal judges* already appointed by the President who were later selected for service *on this judicial committee* by the Chief Judge of the Circuit. It held:

Their selection for service on the Committee does not gain them new positions in any meaningful sense; *to the contrary, service on a committee of the judicial council, when called upon, is merely an outgrowth of their existing responsibilities. See Shoemaker v. United States,* 147 U.S. 282, 301, 13 S.Ct. 361, 391, 37 L.Ed. 170 (1893) (*a statutory expansion of the functions of an existing position does not create a new office requiring re-appointment, at least where the newly-added duties are "germane" to existing functions*). *See also* 28 U.S.C. §§ 291, 292 (the Chief Justice may designate and temporarily assign any circuit judge to act as a circuit judge in another circuit if necessary; chief judges of circuit courts may make similar designations and temporary assignments with respect to district judges and districts within their circuits); *id.* §§ 293–96.

783 F.2d at 1515 (emphasis added). A previously appointed judge is not the same as a previously commissioned officer who is simply "legally trained."

Judge Lamberth of the United States District Court for the District of Columbia also impliedly rejected the "legally trained"

military-officer interpretation of *Shoemaker*. He said:

> The [Supreme] Court rejected this argument [that a commission member could not serve absent Senate approval], holding that:
>
> > As, however, the two persons whose eligibility is questioned were at the time of the passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that *Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed.*
>
> *Id.* [147 U.S.] at 301, 13 S.Ct. at 391 (emphasis added).
>
> The *Shoemaker* case is distinguishable from this case in two important respects. *First, the provision challenged in Shoemaker added certain duties to two offices; it did not confer additional responsibilities on any particular officer. Had the Chief of Engineers of the United States Army or the Engineer Commissioner of the District of Columbia resigned from office after the commission was established, he would no longer have served on the commission*—the new Chief of Engineers or Engineer Commissioner would have taken over those duties. Here, however, Mr. Wall was designated the new Director of OTS. Although the position was given to him by virtue of his prior position, it was given to him.

*Olympic Federal S & L Assn. v. Director, Office of Thrift Supervision,* 732 F.Supp. 1183, 1192–93 (D.D.C.1990) (some emphasis added). Again, no mention whatsoever was made concerning their remaining status as military officers or their general training as engineers.

Lastly, *Gila River Pima–Maricopa Indian Community v. United States,* 8 Cl.Ct. 700 (1985), provides an example of Congress' recognition and treatment of the *Shoemaker* problem. That decision notes that Congress, in constituting the United States Claims Court in 1982 by using trial judges from the old Court of Claims, expressly confronted a *Shoemaker* problem. Judge Merow provided the following footnote in his opinion:

> Thus, in discussing the constitutionality of the provision of Pub.L. No. 97–164 reconstituting the trial division of the Court of Claims into a United States Claims Court comprised of the trial judges of the Court of Claims, H.R.Rep. No. 96–1300, 96th Cong., 2d Sess. 23, n. 25, states as follows:
>
> "Article III, section 1, of the Constitution explicitly empowers the Congress to ordain and establish inferior courts. Consequently, the only questions concern the relation between the power of Congress, under Article I, section 8, cl. 18, of the Constitution to alter, enlarge, or restrict the functions of existing federal officers and the requirement of the Appointments Clause, Article II, section 2, cl. 2, that appointments as officers of the United States be made in the manner prescribed by that clause. Stated differently, this involves a reconciliation of the Supreme Court's decisions in *Shoemaker v. United States,* 147 U.S. 282, 301, 13 S.Ct. 361, 391, 37 L.Ed. 170 (1893), and *Buckley v. Valeo,* 424 U.S. 1, 118–36, 96 S.Ct. 612, 681–90, 46 L.Ed.2d 659 (1976). The earlier case stated the principle that Congress may, by statute, confer new duties on officers of the United States, at least where the new duties are 'germane' to their existing functions, without the necessity of reappointment under the Appointments Clause. The lat[t]er holds that Congress may not itself appoint officers of the United States.
>
> "The Committee has concluded that the carry-over of the trial judges into the

Claims Court is a modification of an existing position rather than a legislative appointment to a new one, governed by *Buckley*. The bill merely would confer 'germane' new duties and extend the tenure of the existing trial judges as permitted by *Shoemaker*, rather than create a new office."

8 Cl.Ct. at 702. Examination of the legislative history of Article 26 especially since 1968 reveals no similar statements by Congress concerning *Shoemaker*'s applicability to "legally trained" or untrained commissioned officers and the newly created position of military judge.

## VII

### *Application to the Present Case*

Finding the *Shoemaker* decision inapplicable, my final concern is whether the system of appointment of a military judge provided in the Uniform Code of Military Justice nonetheless meets the standards of Article II, § 2 of the Constitution. I have noted earlier that military judges are not technically "appointed" under the Code, and their being invested with office *is* a more complicated process than represented in the granted issue. In addition, I note that Major Pesik, the military judge who presided at appellant's court-martial, was a Marine, and the appellate court panel for this case was composed of both Navy and Marine officers.

Turning first to Major Pesik, he was commissioned an officer in the United States Marine Corps by appointment of the President, by and with the Advice and Consent of the Senate. 10 USC § 531(a); *see* 10 USC § 532 or § 593. In accordance with the normal course of events, he rose to the grade of major in the Marine Corps, some of his promotions requiring appointment by the President alone and some also requiring the Advice and Consent of the Senate. 10 USC § 624(c). At some point,

with the approval of the Secretary of the Navy, he was designated "a judge advocate." 10 USC § 5587a. His assignment for duty as a judge advocate of the Marine Corps was made by direction of the Commandant of the Marine Corps. Art. 6(a). Moreover, he was certified by the Judge Advocate General of the Navy to perform the duties of trial and defense counsel detailed for a general court-martial. Art. 27(b). Later, he was certified as qualified to be a military judge and designated for detail as such by the Judge Advocate General of the Navy. Art. 26(b). Finally, he was assigned to duty at the Sierra Judicial Circuit by the Commandant of the Marine Corps on the recommendation of the Judge Advocate General of the Navy.

The Marine Colonel and Navy Captains on the Court of Military Review were also commissioned officers who were appointed by the President with the Advice and Consent of the Senate. Their promotions to these distinguished grades were accomplished by appointment of the President with the Advice and Consent of the Senate. They were constituted a court by the Judge Advocate General of the Navy and designated for detail to it by that same officer.

The bottom line is that none of these military judges was appointed to that position or a germane position by the President alone, the Courts of Law, or the Head of a Department.[8]

## VIII

### CONCLUSION

### *Duty to Inform*

In summary, it is my view that a military judge is not only a military officer but an "inferior Officer" of the United States as provided for in Article II, § 2 of the Constitution. Congress under Article I, § 8 of the Constitution was fully competent to

---

**8.** The term "Heads of Departments" for purposes of the Appointments Clause has recently been defined by the Supreme Court to be a member of the Cabinet. *See Freytag v. Commissioner of Internal Revenue*, 501 U.S. ——, —— ——, 111 S.Ct. 2631, 2642–43, 115 L.Ed.2d 764

(1991). "Courts of Law" are also defined in terms of their "exclusively judicial role." *Id.* at ——, 111 S.Ct. at 2645. Neither the Secretary of the Navy, the Commandant of the Marine Corps, nor the Judge Advocate General of the Navy meets either of these tests.

create such a military judicial position and empower the holder of this office to dispense justice to servicemembers at courts-martial. Having done so, however, it was further required by Article II, § 2 to provide that the person who fills this office be appointed by the President, a Court of Law, or the Head of a Department.

The reason that Congress has not provided for this type of appointment for military judges is not readily apparent. The lead opinion suggests that Congress, cognizant of the decision in *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170, made a conscious decision that a second appointment by the President of a commissioned officer to perform these new court-martial duties was not necessary. Examination of the legislative history of the statutes creating this position, however, offers no express support for this theory. *Cf. Gila River Pima–Maricopa Indian Community v. United States*, 8 Cl.Ct. at 702 n. 1. Moreover, examination of the *Shoemaker* decision in light of the legislation creating the military judge suggests to me that this decision's rationale is inapplicable to the case at bar. *See Olympic Fed. S & L v. Office of Thrift Supervision*, 732 F.Supp. at 1192–93.

My own view is more consistent with congressional silence. The office of military judge was established in 1968 when the Supreme Court utilized a "mode of appointment" approach to the Appointments Clause. *See* Note, *Toward a New Functional Methodology in Appointments Clause Analysis*, 60 G.W.L.Rev. 536, 539–43 (1992); *cf.* Note, *Power of Appointment to Public Office Under The Federal Constitution*, 42 Harv.L.Rev. 426 (1929). In other words, an "inferior Officer" of the United States was a Federal office holder whose appointment Congress

required be made by the President, a Court of Law, or the Head of a Department. *United States v. Mouat*, 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463 (1888). *See Hoeppel v. United States*, 85 F.2d 237, 241 (D.C.Cir.1936). It was not until 1976 in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, that the "mode of appointment" approach was jettisoned in favor of a functional duty approach to Appointments Clause questions. *See* Note, 42 Harv.L.Rev. at 544–52; *see also Freytag v. C.I.R.*, 501 U.S. ——, 111 S.Ct. 2631. In my view, there is simply no doubt that a military judge's duties and responsibilities now qualify him as an "inferior Officer" of the United States.[9]

### The Remedy

Appellant has shown no specific prejudice to his case due to the failure to provide for compliance with the Appointments Clause. However, simple affirmance is not sufficient under the *de facto*-appointee rationale of *Buckley* and the *Northern Pipeline* cases. It is the duty of this Court also to point out the unconstitutional statutory deficiency as this opinion has done. It should be in Congress' hands to render appropriate legislation to fix this statutory deficiency. In the interim, the President could, based on the rationale in this opinion, direct the Head of the Department of Defense to start appointing military judges as necessary to perform military justice functions in the department. *See United States v. Matthews*, 16 MJ 354, 382 (CMA 1983). Thus, the Executive Branch's constitutional role in this area, as envisioned by the Appointments Clause, would be restored.

WISS, Judge (dissenting):

Not since *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364

---

**9.** The Supreme Court has recently denied petitions for certiorari in two cases where this Appointments Clause issue was raised for the first time in that Court. *Bolado v. United States*, —— U.S. ——, 113 S.Ct. 321, 121 L.Ed.2d 242 (1992); *Allen v. United States*, —— U.S. ——, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992). However, as the Supreme Court itself has consistently said, "The

denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States v. Carver*, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923). *See generally* R. Stern, E. Gressman, and S. Shapiro, *Supreme Court Practice* 269–72 (6th ed. 1986).

(1987),[1] has an appeal presented questions of such fundamental importance to the institutional integrity and viability of the military justice system as does this one. Once the legal chaff is separated out, the grain of the related questions of law before this Court is quite clear:

First, in exercising its power "[t]o make Rules for the Government and Regulation of the land and naval Forces" under Article I, § 8, clause 14 of the Constitution, is Congress exempt from the prescriptions of Article II, § 2, clause 2 of the Constitution—the Appointments Clause—regarding appointment of "Officers of the United States"?

Second, within the meaning of the Appointments Clause and the decision in *Freytag v. Commissioner of Internal Revenue*, 501 U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), do Articles 26 and 66 of the Uniform Code of Military Justice, 10 USC §§ 826 and 866, respectively, establish a distinct office of military judge?

Third, if so, does the decision in *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), permit the conclusion that the duties of that distinct office are "germane" to the duties either of military officers generally or "legally trained military officers" specifically, so that the Appointments Clause does not require separate appointment of some such military officers as military judges?

Today, a majority of this Court approves the present practice of appointment of military judges by officials [2] below the rank of those set out in Article II, § 2, clause 2 of the Constitution—the Appointments Clause. In doing so, however, I believe that the various opinions of my colleagues who join in that disposition improperly reconcile the two provisions of the Constitution that are in issue in the first question and incorrectly read the decisions of the Supreme Court of the United States on which answers to the second and third questions depend. Accordingly, I dissent.

### I

Without question, the Constitution vested in Congress the powers to "raise and support Armies" (cl. 12); "provide and maintain a Navy" (cl. 13); and "make Rules for the Government and Regulation of the land and naval Forces" (cl. 14). Art. I, § 8. The critical question at the outset here is not Congress' authority to legislate in this area by constructing a military justice system and providing for trial and appellate military judges; rather, it is whether, in doing so, Congress is free from the facially unconditioned restriction of the Appointments Clause regarding how those military judges must be appointed.

The Chief Judge, particularly in Part IV of his opinion, thoughtfully treats the matter of deference to Congress in its regulation of military affairs. *See United States v. Prive*, 35 MJ 569, 573–77 (CGCMR 1992). The Supreme Court has instructed that "judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v.*

---

1. That is the only case in which the Supreme Court of the United States has granted plenary review of a decision of this Court, *see* Art. 67a, Uniform Code of Military Justice, 10 USC § 867a (1989); *see also* Art. 67(h)(1), UCMJ, 10 USC § 867(h)(1) (1983). There, the Court held that jurisdiction of a court-martial depended solely on the accused's status as a member of the armed forces, not on the "service connection" of the offenses charged. In doing so, the Court expressly overruled its decision in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), that had rested significantly on the historical viewpoint that "[b]oth in England prior to the American Revolution and in our own national history military trial of soldiers committing civilian offenses has been viewed with suspicion." *O'Callahan v. Parker, supra* at 268, 89 S.Ct. at 1688 (footnote omitted), quoted in *Solorio v. United States*, 483 U.S. 435, 442, 107 S.Ct. 2924, 2928, 97 L.Ed.2d 364 (1987).

2. One important dimension to the problem underlying this appeal is that it is not entirely clear *who* "appoints" military judges. As the separate opinion of Chief Judge Sullivan makes apparent, the answer is not the obvious first guess (the Judge Advocate General of each service) and is not consistent among the armed forces.

*Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981), quoted in *Solorio v. United States,* 483 U.S. at 447, 107 S.Ct. at 2931. *See also Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).

Deference, however, does not equate to abdication. The Supreme Court has recognized that, in light of Congress' regulatory powers over the military, constitutional rights might have application and meaning in the military different from the civilian community, *see, e.g., Solorio v. United States, supra* at 447, 107 S.Ct. at 2931. The Court, however, has never instructed that Congress' regulatory power is a talisman, in the face of which the remainder of the Constitution withers. Indeed, quite to the contrary, the Court stated in *Rostker v. Goldberg, supra* at 67, 101 S.Ct. at 2653:

> None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause, but the tests and limitations to be applied may differ because of the military context. We of course do not abdicate our ultimate responsibility to decide the constitutional question, but simply recognize that the Constitution itself requires such deference to congressional choice.

(Citations omitted.)

The Constitution's grant of regulatory power to Congress over military affairs is no more plenary than, for instance, its grant of power to Congress in Article I "[t]o ... provide for the ... general Welfare of the United States" (§ 8, cl.1); or over Federal elections (§ 4); or "[t]o make all Laws which shall be necessary and proper for carrying into Execution" these and other powers specifically set out elsewhere in the Constitution (§ 8, cl. 18). When the Supreme Court in *Buckley v.*

*Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), was presented with the argument that appointment of members of the Federal Election Commission was pursuant to these plenary powers of Congress and, thus, not subject to the Appointments Clause, the Court responded:

> But Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 [4 L.Ed. 579] (1819), so long as the exercise of that authority does not offend some other constitutional restriction. We see no reason to believe that the authority of Congress over federal election practices is of such a wholly different nature from the other grants of authority to Congress that it may be employed in such a manner as to offend well-established constitutional restrictions stemming from the separation of powers.
>
> The position that because Congress has been given explicit and plenary authority to regulate a field of activity, it must therefore have the power to appoint those who are to administer the regulatory statute is both novel and contrary to the language of the Appointments Clause. Unless their selection is elsewhere provided for, *all* officers of the United States are to be appointed in accordance with the Clause.... No class or type of officer is excluded because of its special functions.

424 U.S. at 132, 96 S.Ct. at 688.

I agree. There is nothing anywhere in the Constitution of the United States or in decisions of the Supreme Court that supports the notion that mandates of the Constitution do not penetrate the walls of the military enclave. Further, unlike application of certain individual rights to servicemembers, there is nothing about the Appointments Clause that requires a different application in a military context than it does in the rest of the United States.[3]

---

**3.** Judge Crawford's attempt to distinguish between civilian and military judiciaries based on "military exigencies" is a strawman. Nothing in any of the other opinions in this case would

have any untoward impact whatsoever on the ability of the Judge Advocate General to *tactically move and reassign* military judges or to meet the operational realities of a military in the

Nothing could be plainer than that the Appointments Clause, by its own terms, does not except appointment to offices created under Congress' power to regulate the military any more than it excepts appointment to offices created under any of Congress' other numerous, plenary powers.

In short, as the Supreme Court succinctly stated in *Freytag v. C.I.R.*, 501 U.S. at ——, 111 S.Ct. at 2639, "Neither Congress nor the Executive can agree to waive this structural protection" of the Appointments Clause.[4] Accordingly, if the Uniform Code of Military Justice established a distinct office of military judge, appointments to fill that office must comport with the Appointments Clause.

## II

In an effort to identify who are included as "Officers of the United States" and other "inferior Officers" within the meaning of the Appointments Clause, the Supreme Court has said:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine*[, 99 U.S. 508, 510, 25 L.Ed. 482

(1879)], is a term intended to have substantive meaning. We think its fair import is that *any appointee exercising significant authority pursuant to the laws of the United States* is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article.

*Buckley v. Valeo*, 424 U.S. at 126, 96 S.Ct. at 685 (emphasis added), cited with approval in *Freytag v. C.I.R.*, 501 U.S. at ——, 111 S.Ct. at 2640.[5]

Military judges are "established by Law," and their "duties and functions are ... delineated in a statute"—specifically, Articles 26 and 66 of the Code. *See* 501 U.S. at ——, 111 S.Ct. at 2640. Further, their functions and responsibilities, as fully reflected in the Chief Judge's opinion, 36 MJ at 249, and prescribed in the statute and in the decisions of this Court, are leaps and bounds more than "ministerial tasks"; and "[i]n the course of carrying out these important functions, [military judges] exercise significant discretion." 501 U.S. at ——, 111 S.Ct. at 2640; *see* Criminal Law Note: *An Ongoing Trend: Expanding the Status and Power of the Military Judge*, The Army Lawyer 23 (Dept. of the Army Pamplet 27–50–239, October 1992). In my view, application of the Supreme Court's

---

field, as well as in the garrison. At the same time, there was no occasion of which this Court has been made aware that required any sort of *emergency appointment* of military judges resulting from deployment of our armed forces. Simply stated, Judge Crawford's implied alarm—that appointment of military judges by, say, the Secretary of Defense (*see* opinion, *infra*) somehow undermines the response capability of our armed forces in some manner that appointment by the Judge Advocate General does not—is a *false* alarm.

**4.** Judge Crawford's constricted focus on the purpose of the Appointments Clause is a misstep off the cleared path of the law. As the Supreme Court of the United States unequivocally instructed in *Freytag v. Commissioner of Internal Revenue*, 501 U.S. ——, ——, 111 S.Ct. 2631, 2639, 115 L.Ed.2d 764 (1991), the Appointments Clause not only involves the constitutional tug-of-war between the Executive and Legislative Branches but also ensures that responsibility to make appointments to offices in the Executive Branch will not be delegated and diffused to a

level below the very highest, responsive level of "the President alone," "Courts of Law," or "Heads of Departments."

**5.** As the Chief Judge points out, *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), marked the first time that the Supreme Court used this approach of examining the functions and duties of a purported office to determine whether it was an Office of the United States. Prior to that decision, the approach was one that could fairly be characterized as rather circular: A position was an Office only if Congress required that the position be filled by the President, a Court of Law, or a Head of a Department. In other words, this "mode of appointment" approach essentially concluded that an Office was an Office when Congress *said* it was an Office by providing for appointment thereto consistent with the Appointments Clause. The functional-duty approach followed since *Buckley*, of course, is more consistent with the principle that even Congress cannot legislate in violation of the Appointments Clause, *see Freytag v. C.I.R., supra*.

functional-duty analysis compels the con-
clusion that there is a distinct office of
military judge.

The lead opinion concludes otherwise, af-
ter tracing the evolution of the law mem-
ber to the law officer to the military judge.
As to the final stage in this process, the
plurality opines:

> The Military Justice Act of 1968
> changed the title of the law officer to
> military judge, in order to increase his
> stature, and transferred more duties
> from the president of the court-martial to
> the military judge. *See* Art. 26, 82 Stat.
> 1336. *Since the Act merely transferred
> authority and duties from one official
> of the court-martial to another and re-
> named the law officer, it did not create
> a new office.*

36 MJ at 229 (emphasis added). This casu-
al view of the functions and duties of mili-
tary judges is not only demeaning; it is
inaccurate.

First, the lead opinion itself acknowl-
edges an *incredibly* important *addition* to
the functions and discretion of the military
judge over *any* other single official that
previously sat at a court-martial: To sit,
alone, as a court-martial and determine,
alone, the issue of guilt and the sentence of
a convicted accused in serious non-capital
cases. This extraordinary power extends
to convicting servicemembers of such seri-
ous felonies as murder and espionage and
imposing any sentence other than death—
including life imprisonment. Never before
did any single member of the armed
forces—the president of a court-martial or
anyone else—have the statutory authority
to perform this function.[6]

Second, the lead opinion omits to notice
other important additions to the duties and
responsibilities of a military judge that
were not mere transfers from a president
of a court-martial. For instance, prior to
1969, challenges for cause against a law
officer or members of a court-martial were
determined by the members collectively,
*see* Arts. 41(a) and 51(b), UCMJ, 50 USC
§§ 616(a) and 626(b) (1950), respectively,
recodified as 10 USC §§ 841(a) and 851(b)
(1956), respectively; by contrast, after
1969, a military judge rules finally on all
such challenges, *see* Art. 41(a) (1968). Ad-
ditionally, as footnote 6 of the Chief
Judge's opinion makes clear, Congress was
aware of other important duties that were
given to a military judge that, before, had
not rested with any single official, *e.g.*, " 'to
rule finally on certain procedural matters,
such as motions for findings of not guilty,
on which he now may be overruled by the
court members who are untrained in the
law,' " and " 'for pretrial and posttrial ses-
sions to be held by the military judge with-
out the presence of the court panel for the
purpose of deciding procedural ques-
tions.' " In sum, the role of the military
judge " 'will more closely approximate that
of a civilian trial judge.' " *See* 114 Cong.
Rec. 30564 (1968).

*That* is an *Office.*[7] *See Freytag v.
C.I.R.*, 501 U.S. at ——, 111 S.Ct. at 2640.

---

**6.** The plurality's effort to minimize the remarka-
ble nature of this change, by referring to the
long history of "one-member" *summary* courts-
martial, is off the mark. After all, the Supreme
Court has held that a summary court-martial is
*not even a criminal proceeding. Middendorf v.
Henry*, 425 U.S. 25, 36–42, 96 S.Ct. 1281, 1288–
91, 47 L.Ed.2d 556 (1976).

**7.** In determining this question of whether there
is a distinct office, the lead opinion reflects
significance in subtleties of wording of Articles
26 and 66, and, by comparison, 67, UCMJ, 10
USC §§ 826, 866, and 867, respectively. I sim-
ply make these observations about that exercise.

The Supreme Court in *Freytag v. C.I.R., supra*
at ——, 111 S.Ct. at 2640, initially noted as a
predicate that the office there was one "estab-

lished by Law" and then followed the function-
al-duty approach and focused on the "duties and
functions" delineated in the statute. As to
whether Articles 26 and 66 as a predicate estab-
lish an office of military judge by law, a com-
parison of those provisions with the statutes in
issue in *Freytag* ineluctably lead me to conclude
that Articles 26 and 66 pass muster to do so.
*Compare* 26 USC § 7443A–**Special trial judges**
("The chief judge [of the Tax Court] may, from
time to time, appoint special trial judges who
shall proceed under such rules and regulations
as may be promulgated by the Tax Court."
§ 7443A(a)), *with* Article 1(10), UCMJ, 10 USC
§ 801(10) (" '[M]ilitary judge' means an official
of a general or special court-martial detailed in
accordance with section 826 of this title (article
26)."); Article 26(b) ("A military judge shall be

It is an Office that involves a full range and collection of judicial functions and duties that, prior to 1969, did not repose in any other individual in the military justice system.[8] This factual analogy is consistent with the plain language of the UCMJ, which expressly defines the military judge as "an official." Art. 1(10) (1969).

At the appellate level, the functions and duties of military judges are similarly imposing. A Court of Military Review exercises "awesome, plenary ... powers." *United States v. Cole*, 31 MJ 270, 272 (CMA 1990). It is charged in every case it considers to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact," and it may in a given case "affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Art. 66(c).

In other words, appellate military judges sitting on a Court of Military Review in each case hear and decide all *legal* issues arising from the proceedings below, satisfy themselves that the evidence is *factually* sufficient to sustain the findings, assure that the sentence is *legally* imposable, and determine anew whether the sentence is an *appropriate* one. In addition to these functions during the usual course of appellate review of a court-martial conviction, Courts of Military Review possess and have exercised extraordinary-writ powers where appropriate. *See Dettinger v. United States*, 7 MJ 216 (CMA 1979). *All* this

is done without any second-guessing by any military superior and is subject to review only within the judicial system, by this Court.

By any view, in my opinion, these functions of military judges at the appellate level, like those of military judges at the trial level, are substantially "more than ministerial tasks"; rather, they reflect the exercise of "significant discretion" as well as *final* judgment subject only to judicial review by a superior appellate court. *See Freytag v. C.I.R.*, 501 U.S. at ——, 111 S.Ct. at 2640. Just as surely as I said earlier about military judges at the trial level, these functions and duties of appellate military judges leave no doubt in my mind that Congress created an office of military judge.

### III

Relying on *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), the plurality concludes that

> [a]ssuming, *arguendo*, that a new office was created at some time during the evolution of the military judge, the result is the same, because the duties of the military judge are the same as those traditionally performed by military officers serving as members of courts-martial. As such, they are germane to the duties of a legally trained military officer [detailed as a military judge].

Thus, the plurality reasons, a new appointment is not required. 36 MJ at 230. I join the Chief Judge's reasoning in Part VI of

---

detailed to each general court-martial."); and Article 66(a) ("Each Judge Advocate General shall establish a Court of Military Review which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges.")

That predicate established, however, the real heart of the test relates to the nature and quality of the functions and duties of military judges delineated by those provisions; that inquiry is more fully addressed in my opinion, *supra.*

**8.** The lead opinion points out that some of the functions and responsibilities that, after 1969, rest with the military judge earlier had been those collectively of the members of a court-

martial. Without charting here the source of each of a military judge's duties, suffice to say that some earlier had belonged to members; some earlier had belonged to the president of a court-martial; and some earlier were non-existent—they were reposited for the first time in the office of military judge. Accordingly, I rhetorically ask the plurality: Does the fact that some (even assuming *most,* for this purpose) of the responsibility and discretion that now is lodged in *one* source actually came from *several various* sources in any way change the equation as to whether that *one* source now is an "office" under the functional-duty approach, *see* n.5, *supra?*

his opinion that rejects both this reasoning and its reliance on *Shoemaker*.

Simply stated, *Shoemaker* was a situation in which the Supreme Court looked at the duties of two *particular*, high-level military engineers—the Chief of Engineers and the Engineer Commissioner for the District of Columbia—and concluded that the *additional* duties that Congress purported to give them as members of the Rock Creek Park Commission were germane to their particular offices, so that a second appointment was not necessary. That is a far cry from the extrapolation that the lead opinion now makes: That devolution of specific and highly responsible judicial duties as a military judge is "germane" to some nebulous notion of duties of "legally trained military officers" in general. *Cf.* Criminal Law Note, *supra* at 259. Analogizing in reverse back to *Shoemaker*, what the plurality affirms here would be akin to concluding that the responsible and discretionary functions and duties of the commissioners on the Rock Creek Park Commission were "germane" to duties of *any* military officer trained as an engineer. *Shoemaker* may not be read that broadly.

Finally, I view two significant provisions in the Uniform Code of Military Justice as contradicting the plurality's conclusion that duties of a military judge are germane to the duties of a military officer. First, as Articles 26(b) and 66(a) expressly require that a military judge at both the trial and appellate levels be "a member of the bar of a Federal court or ... of the highest court of a State," military authorities do not have complete control over whether a military officer meets the statutory qualifications to be a military judge. Admission to the practice of law is controlled or regulated by state statute, court rule, or both, and requires comprehensive legal training not provided by the military and a determination of legal competence by the civilian authority. *See* 7 Am Jur 2d, Attorneys At Law § 12; American Bar Association, Comprehensive Guide to Bar Admission Requirements (1992–93). Because a servicemember's admission to the independent bar

by civilian authority is a statutory qualification for a military judge, I cannot conclude that duties of a military judge are germane to the general duties of a military officer, even a "legally trained" one.

Second, as the lead opinion acknowledges, Article 66(a) authorizes appointment of *civilians* as appellate military judges on the Courts of Military Review. The plurality purports to preclude the difficulty that this statutory provision creates with its germaneness theory, but it cannot be evaded. Whether civilians sat as judges in this case is not the point; rather, the pertinent inquiry is: What impact does this statutory authorization have on the interpretation of that statute as a whole relevant to whether the duties and functions of an appellate military judge are "germane" to duties generally of a military officer, even one "legally trained"? The express statutory provision for civilians on the appellate court is inconsistent with the plurality's germaneness theory. The plurality disregards this inconsistency; I cannot do so.

## CONCLUSION

In summary, I conclude that Congress is not exempt from the strictures of the Appointments Clause of Article II, § 2, clause 2 of the Constitution when it exercises its powers under Article I, § 8, clause 14 of the Constitution to regulate the land and naval forces. *See Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612. Considering the functions and duties of military judges, I conclude that Congress established a distinct office of military judge in Articles 26 and 66 of the Uniform Code of Military Justice, so the Appointments Clause must be complied with in filling that office. *See Freytag v. C.I.R.*, 501 U.S. ——, 111 S.Ct. 2631. Finally, I conclude that a prior general appointment as a military officer will not satisfy the Appointments Clause in this regard because the specific judicial duties required of the office of military judge—as opposed to duty as a military officer—are not "germane" to duties of a "legally trained" military officer in general. *See*

*Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361.

Because a majority of this Court, on the other hand, is of the view that the present method of appointing military judges meets constitutional requirements, I need not decide whether these appointments can be affirmed under the *de facto*-appointee rationale of *Buckley,* as discussed by the Chief Judge. 36 MJ at 256. I point out, though, that even that rationale has certain logical and legal limitations.[9]

9. The Chief Judge touches on some of these issues in Part VIII of his opinion in which he suggests the possibility of interim Presidential direction on appointments through the Secretary of Defense. In addition, the appropriate time for effecting statutory remedial action would be at issue. For instance, in implementing the *de facto*-appointee rationale in *Buckley v. Valeo,* 424 U.S. at 142–43, 96 S.Ct. at 693, the Supreme Court stayed its judgment for a period of 30 days to afford Congress an opportunity to reconstitute the Federal Election Commission and, in the interim, allowed the commission to function *de facto.* Also, by analogy, in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which involved a jurisdictional void created by a ruling that a system of bankruptcy courts was unconstitutional, the Supreme Court delayed its mandate for several months to permit Congress an opportunity to implement remedial action. After the initial delay, 458 U.S. at 88, 102 S.Ct. at 2880, the Court granted a further delay of some 2½ months. 459 U.S. 813, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982). *Cf. United States v. Matthews,* 16 MJ 354, 382 (CMA 1983) (in decision finding court-martial death-penalty sentencing procedures unconstitutional, mandate withheld for 90 days to allow opportunity to change those procedures in time for appellant's resentencing).